445 So.2d 1124 (1984)
John W. TURNER, Jr., As Property Appraiser of Volusia County, Florida, Appellant,
v.
The TRUST FOR PUBLIC LAND, a California Non-Profit Corporation, Appellee.
No. 83-351.
District Court of Appeal of Florida, Fifth District.
March 1, 1984.
William M. Barr of Raymond, Wilson, Conway, Barr, Burrows & Jester, Daytona Beach, for appellant.
James Elliott Messer and Robert S. Goldman of Messer, Rhodes & Vickers, Tallahassee, for appellee.
FRANK D. UPCHURCH, Jr., Judge.
John W. Turner, Jr., as property appraiser for Volusia County, appeals from a summary final judgment ruling that a tract of land located in Volusia County was entitled to an exemption from ad valorem taxation when owned by The Trust for Public Land (TPL).
TPL was established in 1972 as a California non-profit corporation with the specific and primary purpose of acquiring on behalf of the general public open lands for the preservation of native plants or animals, biotic communities, geological or geographical formations of scientific interest, or for recreation and scenic beauty. The articles of incorporation prohibit any director, officer or member of TPL from receiving any benefit arising from the net income or assets of TPL.
The land whose tax status is challenged by the appraiser is called "Turnbull Hammock." It contains 1,168 acres consisting of wetlands and lowlands, with some areas seasonally covered by water. As a "hydric hammock" or "cypress swamp" the property is environmentally significant, serving *1125 as a buffer and filtration system for waters flowing into the Indian River.[1] TPL acquired the land from the Crane family by gift in 1974. The Crane family had owned adjoining lands which they sold to a developer but Turnbull Hammock was unsuitable for development. The property had an appraised value of $292,000 in 1977 and was sold by TPL to the St. Johns River Water Management District in 1980 for $116,000.
Both parties moved for summary judgment agreeing there was no issue of material fact and the trial court, in considering the tax exempt status of the land, distilled the arguments into three basic issues: 1) the non-profit status of TPL; 2) the charitable nature of TPL's purposes and activities; and 3) whether TPL used the property for charitable purposes.
As to non-profit status and TPL's purposes and activities, section 196.195(4), Florida Statutes (1981), provides that:
No application for exemption may be granted for religious, literary, scientific or charitable use of property until the applicant has been found ... to be non-profit.
There is no evidence in the record to counter TPL's status as a non-profit corporation. The salaries of its officers are reasonable, and money received from the sale of property is used to purchase other property to further the corporation's environmental objectives. It is authorized as a non-profit corporation in twenty-six states and the District of Columbia. It is classified as a charitable organization by the Internal Revenue Service and is eligible to receive tax deductible contributions.
Turner contends that "TPL is not engaged in the business of preserving and protecting environmentally endangered lands, but that it is in the business of acquiring and marketing lands at a profit and the quicker the turnover the better." Turner argues that because TPL acquired the instant property by gift and then sold it there has been a profit and this makes TPL a for profit corporation. We believe, however, that the trial court correctly stated the key question for the purposes of non-profit inquiry to be, what is the disposition of such gain?[2] The trial court found that "use of such funds to maintain the Trust's existence and advance its charitable objectives is entirely consistent with its non-profit status." This conclusion is in harmony with Miami Battlecreek v. Lummus, 140 Fla. 718, 192 So. 211 (1939), wherein the supreme court indicated that the fact that an organization receives income will not defeat a charitable property tax exemption where such funds are devoted to charitable purposes of the institution.[3]
*1126 The remaining question is whether TPL established that it "used" Turnbull Hammock for a "charitable purpose" within the meaning of Florida's ad valorem tax exemption laws.
The charitable purpose exemption is authorized in Article VII, section 3(a), Florida Constitution, which provides in part:
Such portions of property as are used predominantly for educational, literary, scientific, religious or charitable purposes may be exempted by general law from taxation.
A "charitable purpose" is defined in section 196.012(6), Florida Statutes (1981), as follows:
"Charitable purpose" means a function or service which is of such a community service that its discontinuance could legally result in the allocation of public funds for the continuance of the function or service.
There can be little question that conservation serves a public purpose. Article II, section 7 of the Florida Constitution provides, "It shall be the policy of the state to conserve and protect its natural resources and scenic beauty... ." The Florida legislature has implemented this policy through a number of statutory programs including chapter 373, Florida Statutes (The Florida Water Resources Act of 1972) and chapter 403, Florida Statutes (The Florida Air and Water Pollution Control Act). As the trial court noted:
These statutes contain comprehensive regulatory schemes to promote conservation; they commit public funds to that objective; and they specifically contemplate public acquisition of real property as a means of achieving it. In sum, they demonstrate that public funds `could' legally be allocated to advance the Trust's objectives. Indeed, the record establishes that Turnbull Hammock was ultimately purchased and is maintained with public funds by the St. Johns River Water Management District, pursuant to Section 373.139, Florida Statutes.
Turner argues that the trust made no actual use of the property before it was sold in that there were no expenditures for management or protection of the parcel, no construction of native trails, walkways, educational facilities or anything else to enhance the tract for educational, recreational or environmental purposes. However, without question this land serves the greatest public good if left in its natural state. While Turner refers to the land as "marginal" and useful only to "hold the world together", it is an important element in the ecological balance of east-central Florida. If the filtration function alone of this land was lost, the cost to the state both ecologically and financially would be substantial. By holding the land in its natural state, the greatest public good was achieved. In this regard, we agreed with the New York court in Wildlife Preserves, Inc. v. Scopelliti, 66 Misc.2d 611, 321 N.Y.S.2d 1004 (Sup. Ct. 1971). In that case, a non-profit corporation whose objects were to preserve and hold land for the study of flora and fauna sought a tax exemption. The court held that use for such purpose does not require constant or vigorous activity, only a devotion to the exempt purpose:
It would seem apparent that the principal elements in a wildlife sanctuary are the natural habitat and the wildlife that it attracts, and that the principal activities which make these features available for maximum use are those which preserve the habitat as nearly as possible in its natural state and protect the wildlife from the depreciation of the indiscriminate hunter and the vandal. (emphasis supplied)
321 N.Y.S.2d at 1007. See also City of Sarasota v. Mikos, 374 So.2d 458 (Fla. 1979) (involving "municipal purpose" ad valorem tax exemption for cities and holding that *1127 there is no requirement of an active use of such property).
AFFIRMED.
SHARP and COWART, JJ., concur.
NOTES
[1] The importance of such wetland property cannot be overstated. The natural mixing of fresh and salt water in wetlands creates a rich region for the growth of a wide variety of living organisms, including microscopic species, fish, shell-fish, birds and mammals, many of them indigenous to the wetlands, while others depend on the wetlands for a significant part of their life cycle. At least two-thirds of all animal species in the oceans spend part of their life cycle in estuarine waters or depend on other species that do. See 2 Grad, Treatise on Environmental Law § 10.04. Biologically, wetlands are highly productive. The amount of energy converted from light, nutrients and carbon dioxide to plant tissue per unit of area exceeds such primary productivity in the oceans or deep lakes and in value, this process may in coastal wetlands exceed that of the richest continental wheat fields. Id. See Environmental Protection Agency, Water Quality Office, Technical Support Division, The Economic and Social Importance of Estuaries, at 3 (Estuarine Pollution Study Series-2), cited by Grad, supra.
[2] Upon dissolution, all trust assets of TPL must be distributed only to another charitable corporation.
[3] Turner's claim that TPL served no function because the Crane family could have received the same income tax benefits had the gift been made directly to the St. Johns River Water Management District requires little discussion. What motivated the Crane family has no relevance here. Whether they were persuaded to make the gift purely for their income tax advantage or because of their interest in conservation has no bearing on whether the land qualified as exempt property for ad valorem tax purposes when owned by TPL. They may very well have preferred to make their gift through TPL because they could avail themselves of the income tax benefits and, if they foresaw the sale to the state, assure retention of this ecologically significant land for the public good, as well as providing funds for TPL to further serve the cause of conservation within Florida or other areas, thereby multiplying the effect of their generosity in the cause of conservation.