74 Mass. App. Ct. 701 (2009) 701

Mary Ann Morse Healthcare Corp. *v.* Board of Assessors of Framingham.

# Mary Ann Morse Healthcare Corp. *vs.* Board of Assessors of Framingham.

No. 08-P-1717.

Suffolk. May 7, 2009. - July 27, 2009.

Present: Grainger, Brown, & Rubin, JJ.

*Taxation,* Real estate tax: abatement, charity, exemption.

The Appellate Tax Board erred in denying the taxpayer, a corporation operating an assisted living facility on certain real property, an exemption from taxation on that property pursuant to G. L. c. 59, § 5, Third, where the taxpayer indisputably performed a traditional public charitable function (i.e., the provision of housing and assistance for those suffering from Alzheimer's disease and similar conditions) [702-705], and where the occupancy of that housing by the beneficiaries of the taxpayer's charity did not preclude a conclusion that the taxpayer occupied the property in question for tax exemption purposes [705-707].

This court remanded a matter to the Appellate Tax Board for the purpose of determining the unresolved issue of the applicability of a real estate tax exemption to certain real property owned by the taxpayer. [707-708]

Appeal from a decision of the Appellate Tax Board.

*George A. Balko, III (Donna M. Truex* with him) for the taxpayer.

Grainger, J. In this appeal from a decision of the Appellate Tax Board (board) we are called upon to review the denial of an exemption from real estate taxation pursuant to G. L. c. 59, § 5, Third. Mary Ann Morse Healthcare Corp. (Morse) operates an assisted living facility known as Heritage of Framingham (Heritage) on real property located in the town of Framingham (town). After the town's board of assessors denied Morse's application for an abatement of real estate taxes, Morse filed a timely but unsuccessful appeal to the board. Specifically, Morse asserts error in the board's failure to find that (a) Morse operates as a traditional public charity relieving its residents from the hardships

and constraints that afflict them; (b) Morse serves a sufficiently large and fluid segment of the population to qualify for real estate tax exemption under G. L. c. 59, § 5, Third; (c) Morse's charitable purpose and use of the property advance the public good, and thereby lessen the burdens of government; (d) Morse owns and occupies the Alzheimer/dementia portion of the property for its charitable purpose; and (e) seventy-one percent of the property (consisting of the Alzheimer's/dementia portion of the property and those portions of the common areas that service Alzheimer's and dementia residents) is exempt from real estate taxation under G. L. c. 59, § 5, Third.

The facts appear undisputed.[1] Morse is exempt from Federal income taxation under § 501(c)(3) of the Internal Revenue Code and has no shareholders or capital stock. No part of its income is utilized for anything other than its charitable purposes.[2] At all relevant times, Morse operated Heritage as an assisted living facility at the property. Heritage consists of two buildings: Building A, which contains common areas and forty-eight assisted living apartments, and Building B, which contains forty assisted living apartments (known as the Homestead apartments) intended for use by individuals with Alzheimer's disease, dementia, and memory impairment. Morse contends that all parts of Heritage used by the Homestead residents are exempt from taxation, including all of Building B and the common areas of Building A, which also serve the Homestead residents.

*Discussion.* We review the board's decision for errors of law. See *South St. Nominee Trust* v. *Assessors of Carlisle*, 70 Mass. App. Ct. 853, 855-856 (2007), and cases cited. The board's

---

[1] The town did not file a brief or supplement the record in this appeal.

[2] Morse's articles of incorporation list its charitable purposes as follows:

"1. To establish, acquire, operate and maintain nursing homes and long term care facilities within the Commonwealth of Massachusetts . . . and to provide such medical, educational and charitable services as may be consistent with any license granted to the corporation by any governmental agency or as may be otherwise lawful.

"2. To advance the knowledge and practice of medicine and nursing through research and education relating to the care, treatment and healing of patients.

"3. To improve public health in cooperation with federal, state, municipal, and other health departments and offices."

findings of fact must be supported by substantial evidence. The board determined that Morse met neither part of the twofold test for determining whether an organization qualifies for property tax exemption pursuant to G. L. c. 59, § 5, Third, and we consider each part in turn.

*The community benefit test.* The board's decision relies in large part on the Supreme Judicial Court's discussion in *Western Mass. Lifecare Corp.* v. *Assessors of Springfield,* 434 Mass. 96 (2001), and cases cited therein. *Western Mass. Lifecare* provides detailed guidance on the factors relevant to a determination that an organization provides a public benefit sufficiently broad to justify the public support that tax exemption represents. "An organization 'operated primarily for the benefit of a limited class of persons,' such that 'the public at large benefit[s] only incidentally from [its] activities,' is not charitable." *Id.* at 104, quoting from *Cummington Sch. of the Arts, Inc.* v. *Assessors of Cummington,* 373 Mass. 597, 600 (1977). "While there is no 'precise number' of persons who must be served in order for an organization to claim charitable status, and 'at any given moment an organization may service only a relatively small number of persons,' membership in the class served must be 'fluid' and must be 'drawn from a large segment of society or all walks of life.' " *Western Mass. Lifecare, supra* at 104, quoting from *New England Legal Foundation* v. *Boston,* 423 Mass. 602, 612 (1996). "[S]election requirements, financial or otherwise, that limit the potential beneficiaries of a purported charity will defeat the claim for exemption." *Western Mass. Lifecare, supra* at 104.

The board's decision issued in September, 2007, and Morse requested a report with findings of fact. See G. L. c. 58A, § 13. Although the board's report was promulgated on August 19, 2008, some five weeks after the Supreme Judicial Court issued its decision in the case of *New Habitat, Inc.* v. *Tax Collector of Cambridge,* 451 Mass. 729 (2008), the board's findings and report make no reference to that case. *New Habitat* provides an interpretive lens through which we now view *Western Mass. Lifecare* and its predecessors. Specifically, *New Habitat* emphatically conditions the importance of previously established factors on the extent to which "the dominant purposes and methods of the organization" are traditionally charitable. *Id.* at 733. The

number of individuals receiving services, whether they are from diverse walks of life, the fees charged to those individuals, and the relationship between the service fees and the cost of those services to the provider — all these are factors that inform a decision under the community benefit test; where however an organization is found to be traditionally charitable in nature, these factors play "a less significant role in our determination of its charitable status" for purposes of property tax exemption. *Id.* at 737. Applying this approach in *New Habitat*, the Supreme Judicial Court vacated the summary judgment entered below for the tax collector and ordered summary judgment to be entered instead for the taxpayer. *Id.* at 739.

In this context we examine the board's determination that Morse does not qualify as a public charity under the community benefit test. The board found that the fees charged by Morse, combined with the fact that Medicaid is unavailable to cover those fees, placed Morse "beyond the reach of a sufficiently broad cross-section of the elderly population."[3] We note, however, that in comparison to the facts analyzed in *New Habitat*, Morse charges much lower fees and provides services to a much larger group of residents. While the dramatic disparity in these cases[4] might theoretically be reconciled by an equally dramatic difference in the extent to which the taxpayer in each case performed traditionally charitable functions, the record does not support such a justification. See, e.g., *H-C Health Servs., Inc.* v. *Assessors of S. Hadley*, 42 Mass. App. Ct. 596, 599 (1997) ("[O]peration of a nursing home for the elderly and the infirm is the work of a charitable corporation"); *William B. Rice Eventide Home, Inc.* v. *Assessors of Quincy*, 69 Mass. App. Ct. 867 (2007) (discussion of proper method and deadline for nursing home to appeal loss of exemption after many years of recognition as a charitable

---

[3]Conversely, in *New Habitat*, the court held that a taxpayer would "not fail to qualify for charitable status merely because its residents have the means to live elsewhere before they become dependent on the State for care." *New Habitat*, 451 Mass. at 738.

[4]The board found that Morse charged monthly fees of between $4,100 and $5,920 for the residential apartments here at issue, serving forty Alzheimer's/dementia patients. New Habitat's monthly fees ranged from $17,000 to $18,000 in a facility able to accommodate four residents suffering from brain damage, and housing but two at the time of the appeal in that case. 451 Mass. at 730.

institution under G. L. c. 59, § 5, Third). Moreover, the board has not referred to this consideration in its decision.

Considering Morse's indisputable performance of a traditional public charitable function, the record before us, and the guidance of *New Habitat*, we conclude that the board's determination that Morse is not a public charity under the provisions of G. L. c. 59, § 5, Third, was error.

*The occupancy test.* The board also concluded that the individual residents of Homestead occupied the premises, and that therefore Morse could not be an occupant for purposes of an exemption analysis under G. L. c. 59, § 5, Third. In so concluding the board relied heavily on G. L. c. 19D, which it characterized as providing Homestead residents the "legal status as tenants."[5] *Charlesbank Homes* v. *Boston*, 218 Mass. 14 (1914) (residents in low rent apartments owned by charitable corporation are strictly tenants, and are occupants thereof). Additionally, the board pointed to various provisions in the residency agreement, specifically the privacy rights conferred on the residents, the expectation that residents would carry their own insurance, and the residents' entitlement to have their recommendations and grievances addressed by Morse.

As stated above, we review the board's decision, including its application of G. L. c. 19D, for errors of law. In interpreting c. 19D, the board is deriving a tax implication from a statute covering an unrelated area and empowering a separate agency with regulatory authority.[6] While we give "deference to the expertise of the board in tax matters involving interpretation of the laws of the Commonwealth," *Northeast Petroleum Corp.* v. *Commissioner of Rev.*, 395 Mass. 207, 213 (1985), we give no deference to an incorrect interpretation. See *Kszepka's Case*, 408 Mass. 843, 847 (1990).

We concur that there is a rational nexus between the residents' right to privacy and the question of occupancy; however, unlike

[5]The board cited the following sections of G. L. c. 19D: § 9(18) (requiring Morse to comply with the eviction requirements set forth in G. L. c. 186 or c. 239), and § 16 (requiring assisted living residences to have specified private bathroom facilities and access to cooking capacity for the residents).

[6]General Laws c. 19D, § 4, vests the Executive Office of Elder Affairs with the authority to certify sponsors of assisted living residences, who in turn are responsible for managing those residences according to the applicable laws and regulations.

the board we do not consider it to be a persuasive indication that Morse does not occupy the property. There are several reasons why the two factors are less than congruent. We note, first, that occupancy need not be exclusive, and that the occupancy test for property tax exemption is nowhere so described. While exclusive possession of a tenant has been held to defeat occupancy by another, see *Charlesbank Homes, supra* at 16-17, that is not the case presented by this record, which establishes without dispute shared rights to the premises.[7] Nor are occupancy and residence identical concepts under the law.[8] We are therefore unpersuaded that G. L. c. 19D's procedural protections against eviction, while indisputably relevant to the residents' status, should also provide a conclusive basis to characterize Morse's status.[9]

The traditional charitable purpose in which Morse is engaged, the very factor emphasized in *New Habitat*, here consists of providing living space and residential assistance to individuals who are unable to manage on their own. The board's emphasis on Morse's use of the property to provide residences — and a certain level of residential privacy — for the recipients of its services amounts to penalizing Morse for performing the charitable function that constitutes its mission. This anomalous result is difficult to defend under the charitable tax exemption regime of G. L. c. 59, and finds no support in the peripherally related purposes of G. L. c. 19D.

The residential agreement between Morse and the residents also provides insight into the question of occupancy, including the element of privacy. While absolute privacy suggests exclu-

---

[7]Cases dealing with analogous shared possession have held that, in the absence of exclusive possession by tenants, the owner is considered the "occupant." See *M.I.T. Student House, Inc.* v. *Assessors of Boston,* 350 Mass. 539, 542 (1966) (occupation of cooperative living arrangement home was by corporation rather than those to whom it afforded home). See also *Franklin Square House* v. *Boston,* 188 Mass. 409, 410-411 (1905) (holding the same for a "home for working girls").

[8]"Resident" is defined as "[a] person who lives in a particular place," while "[o]ccupant" is defined as "[o]ne who has possessory rights in, or control over, certain property or premises." Black's Law Dictionary 1335, 1108 (8th ed. 2004).

[9]For example, Morse's possessory rights in the face of foreclosure or eminent domain are at least equal to, if not greater than, tenants' rights in the face of eviction.

sive occupancy, inferentially derived from exclusive possession of, or control over, the area in question, the residents' privacy here is far from absolute. They are entitled to twenty-four hours' notice before Morse enters an apartment, with the notable exceptions of entry to carry out the services provided by the contract or in case of an emergency. This, again, places the emphasis where it belongs, namely on Morse's presence in each apartment to perform its charitable function. Inasmuch as a predicate for the residents' occupancy is their need for Morse employees also to be present to assist them with daily living and medical needs, it is unsurprising that their right to privacy is correspondingly conditioned. Accordingly, we reject the inference of Morse's nonoccupancy derived by the board from the existence of certain privacy rights and eviction safeguards vested in the residents by statute and by the residency agreement.

The other indicia of residents' occupancy relied upon by the board are the right to have recommendations and grievances addressed and the expectation that they will carry property insurance.[10] While these factors provide some, albeit not strong, basis for characterizing the residents as occupants, they do not, as noted above, preclude occupancy by Morse.

*Conclusion.* Morse performs a long recognized, traditionally charitable, function. Under the standards of our case law, as most recently enunciated by *New Habitat*, the board's findings require the conclusion that Morse provides a community benefit in its provision of housing and assistance to those suffering from Alzheimer's disease and similar conditions. In order to provide this benefit, Morse owns and administers real property in which it provides residences for those who benefit most directly from its charitable purpose. The board erred in concluding that the occupancy of those residences by the beneficiaries of Morse's charity resolves the issue of Morse's occupancy for purposes of determining G. L. c. 59 tax exemption eligibility. The board's findings, and the record as a whole, establish Morse's occupancy for tax exemption purposes where it is undisputed that the residents'

---

[10]We also note that the residency agreement, provided in the record, contains a reference to "the Owner's right to require changes in the apartments," suggesting that Morse controls the placement and, if necessary, the relocation of residents within the Heritage facility.

occupancy is conditional on, and dependent on, Morse's regular presence and control.

Finally we note that the board's report made it unnecessary to consider the common areas of Building A, and consequently contains no findings on the use of those areas. As noted *supra*, Morse claimed a partial exemption for Building A, characterizing the common areas of that building as serving the residents of Building B; the applicability of the exemption to those common areas remains unresolved.

We vacate the decision of the board and remand the matter for the purpose of determining the taxable status of the Building A common areas. A new decision shall enter granting Morse a tax exemption and abatement of its real estate tax consistent with this opinion.

*So ordered.*