New England Forestry Foundation v. Board of Assessors of Hawley.

NEW ENGLAND FORESTRY FOUNDATION, INC. *vs.* BOARD OF
ASSESSORS OF HAWLEY.

Suffolk. January 6, 2014. - May 15, 2014.

Present: IRELAND, C.J., SPINA, CORDY, BOTSFORD, GANTS, DUFFLY, & LENK, JJ.

*Administrative Law,* Agency's interpretation of statute, Findings, Judicial
review, Appellate Tax Board: final decision. *Taxation,* Real estate tax:
charity, exemption, Appellate Tax Board: appeal to Supreme Judicial
Court, findings, Judicial review. *Charity. Corporation,* Non-profit corporation.
*Statute,* Construction.

The Appellate Tax Board erred in denying a charitable tax exemption under
G. L. c. 59, § 5, Third (Clause Third), on a parcel of forest land owned by
the plaintiff nonprofit corporation, where the reduced-taxation scheme for
privately held, undeveloped forest land under G. L. c. 61 did not preclude
the plaintiff from eligibility for an exemption under Clause Third [142-145];
where nothing in the tax exemption in the enabling act of the Trustees of
Reservations (Trustees), St. 1891, c. 352, § 1, nor in the present legal
treatment of the Trustees, evidenced a legislative intent to exclude from a
property tax exemption conservation organizations that otherwise met the
requirements of Clause Third [145-148]; where the plaintiff was a charit-
able organization that occupied its undeveloped forest land for charitable
purposes within the meaning of Clause Third [148-155]; and where the
plaintiff occupied its land in furtherance of its charitable purpose [155-159].

APPEAL from a decision of the Appellate Tax Board.

The Supreme Judicial Court granted an application for direct
appellate review.

*Douglas Hallward-Driemeier (Jesse Mohan Boodoo & Jacob
Scott* with him) for the plaintiff.

*Rosemary Crowley (David J. Martel* with her) for the defendant.

The following submitted briefs for amici curiae:

*Robert H. Levin,* of Maine, for Massachusetts Land Trust
Coalition, Inc., & another.

*Gregor I. McGregor & Luke H. Legere* for Massachusetts
Association of Conservation Commissions, Inc., & another.

*James F. Sullivan* for Massachusetts Association of Assessing Officers.

*Robert E. McDonnell & Patrick Strawbridge* for The Nature Conservancy & another.

*Lisa C. Goodheart, Susan A. Hartnett, Phelps T. Turner, & Joshua D. Nadreau* for The Trustees of Reservations.

SPINA, J. This case comes to us on direct appellate review from a decision of the Appellate Tax Board (board). The taxpayer, New England Forestry Foundation, Inc. (NEFF), is a nonprofit corporation organized under G. L. c. 180. NEFF is the record owner of a 120-acre parcel of forest land in the town of Hawley (Hawley). In 2009, NEFF applied to the board of assessors of Hawley (assessors) for a charitable tax exemption on the parcel under G. L. c. 59, § 5, Third (Clause Third).[1] The assessors denied NEFF's application, and NEFF appealed to the board. The board likewise denied the application on the basis that NEFF had failed to carry its burden to show that it occupied the land in Hawley for a charitable purpose within the meaning of Clause Third. NEFF again appealed, and both NEFF and the assessors filed applications for direct appellate review. We granted the parties' applications, and we reverse the board's decision.[2]

1. *Background.* The taxpayer, NEFF, is a Massachusetts nonprofit corporation organized under G. L. c. 180, and it has received tax-exempt status from the Federal government under 26 U.S.C. § 501(c)(3) (2006). NEFF was incorporated in 1944 and pursues the mission of "providing for the conservation and ecologically sound management of privately owned forestlands in New England, throughout the Americas and beyond." NEFF is dedicated to several activities in furtherance of this mission

---

[1] General Laws c. 59, § 5, Third (Clause Third), in relevant part, exempts from taxation "real estate owned by or held in trust for a charitable organization and occupied by it or its officers for the purposes for which it is organized."

[2] We acknowledge the amicus briefs submitted in support of New England Forestry Foundation, Inc. (NEFF), by The Nature Conservancy and Massachusetts Audubon Society; The Trustees of Reservations; Massachusetts Land Trust Coalition, Inc., and Land Trust Alliance, Inc., and Massachusetts Association of Conservation Commissions, Inc.; and The Compact of Cape Cod Conservation Trusts, Inc. We also acknowledge the amicus brief submitted in support of the board of assessors of Hawley (assessors) by Massachusetts Association of Assessing Officers.

including "[e]ducating landowners, foresters, forest product industries, and the general public about the benefits of forest stewardship and multi-generational forestland planning"; "[p]ermanently protecting forests through gifts and acquisitions of land for the benefit of future generations"; "[a]ctively managing [f]oundation lands as demonstration and educational forests"; "[c]onservation, through sustainable yield forestry, of a working landscape that supports economic welfare and quality of life"; and "[s]upporting the development and implementation of forest policy and forest practices that encourage and sustain private ownership." In its 2010 restated articles of organization, NEFF described its charitable purposes in part as to "create, foster, and support conservation, habitat, water resource, open space preservation, recreational, and other activities" by "promoting, supporting, and practicing forest management policies and techniques to increase the production of timber in an ecologically and economically prudent manner," to utilize "best management practices . . . to protect habitat, water, and other natural resources," and to "support and engage in and advance scientific understanding of environmental issues through research." As one of the largest land conservation organizations in Massachusetts, NEFF owns over 23,000 acres of land in five States and holds conservation easements on over one million additional acres across seven States. Of NEFF's land holdings, approximately 7,500 acres are located in Massachusetts in thirty-nine municipalities.

The property at issue in this case is a 120-acre parcel of forested land known as the Stetson-Phelps Pine Ridge Farm (Hawley forest). NEFF purchased the forest as part of a larger tract of land in 1999 from private landowners, Muriel Shippee and her brother, Harold Phelps. According to NEFF, the farm and its surrounding land had been in Shippee's family for generations, and she sold the land to NEFF in order to ensure that it would not be developed. After NEFF purchased the entire tract, it subdivided the land and sold a portion containing a house and barns and approximately twenty acres of open field to private landowners with no connection to the organization. However, NEFF retained a conservation restriction over the property to ensure that it is not developed in the future. The remainder of the

land, owned by NEFF, constitutes the Hawley forest and is abutted on two sides by the Kenneth Dubuque Memorial State Forest, which is owned and maintained by the Department of Conservation and Recreation.

Soon after acquiring the forest from Shippee and Phelps, NEFF hired an independent licensed forester to develop a "forest management plan" for the maintenance of the forest.[3] The first round of activities recommended by the plan was carried out in 2000, and included such actions as removal of "mature and poor quality white pine and spruce saw logs" to "release good quality growing stock"; "[c]ombination strip cuts and patch cuts for wildlife and softwood regeneration," and the layout of a "loop demonstration trail" near "old growth type hemlocks" taking into consideration "erosion on fragile soils." In 2009, the plan was updated, and a tree inventory of the forest was conducted. The 2009 plan recommended that NEFF conduct a patch harvest of approximately sixty-five acres in 2010 and a harvest of a second patch in 2016.

Prior to tax year 2010, NEFF had applied for and received forest-land classification for the Hawley forest under G. L. c. 61, § 2. Chapter 61 sets forth a reduced-taxation scheme for private landowners who hold forest land in an undeveloped state and manage the land according to a forest management plan issued by a licensed State forester. G. L. c. 61, §§ 1-8. Accordingly, for tax year 2010, property tax on the Hawley forest was assessed to NEFF at a reduced rate totaling less than $200, despite the land's $96,000 value. In a letter to the assessors, NEFF explained that it subsequently applied for a full property tax exemption under Clause Third, rather than accepting the reduced taxation under G. L. c. 61, due in part to the administrative costs of preparing for and filing for G. L. c. 61 status on all its properties because G. L. c. 61, § 2, requires renewal every ten years.

NEFF submitted its application for a Clause Third property

---

[3]According to the testimony of NEFF's conservation easement coordinator and forester, a "forest management plan" is a strategic plan for the maintenance of a forest that identifies characteristics of the forest that need to be managed and goals for the long-term management of the natural resources contained in a forest. Foresters in Massachusetts must be licensed pursuant to G. L. c. 132, §§ 47-50, and 302 Code Mass. Regs. §§ 14.00 (2013).

tax exemption in November, 2009. Clause Third provides that the real property of a charitable organization is exempt from taxation if the land is occupied by the charitable organization or its officers for the purposes for which it was organized. In April, 2010, the assessors deemed NEFF's application denied as of February, 2010, on the basis that NEFF had failed to provide sufficient information to enable the assessors to make a decision regarding its application for exemption within the three-month period required by statute. See G. L. c. 59, § 64.

NEFF appealed to the board under formal adjudication procedures set forth in G. L. c. 58A, § 7, and G. L. c. 59, §§ 64 and 65. Following an adjudicatory hearing, the board issued a thorough, written opinion including findings of fact and conclusions of law. The board denied NEFF's request for an exemption on the basis that NEFF had failed to carry its burden to show that it occupied the land in Hawley for a charitable purpose within the meaning of Clause Third. Specifically, the board concluded that NEFF was not carrying out a charitable purpose within the meaning of the statute because forest management is not a traditional charitable purpose and because the benefits of NEFF's activities in the Hawley forest do not inure to a sufficiently large and fluid class of persons due in part to NEFF's insufficient efforts to promote the use of the land by the public. The board further concluded that NEFF did not occupy the Hawley forest in furtherance of its claimed charitable purposes because it offered "at best vague testimony" regarding what it termed "active management" of the land, and provided evidence of only one planned educational activity to take place in the Hawley forest. Additionally, the board concluded that a Clause Third exemption was not available to NEFF because the tax reduction scheme for forest land under G. L. c. 61 demonstrates that the Legislature intended only to reduce the tax burden on forest land, not to eliminate it completely. Although the board's findings of fact are supported by substantial evidence, we conclude that the board erred in denying NEFF a charitable tax exemption under Clause Third.

2. *Application of G. L. c. 59, § 5, Third.* As a threshold matter, the assessors argue, as the board held, that a Clause Third exemption is not available to NEFF in part because the Legis-

lature intended G. L. c. 61 to be the extent of the tax benefit af-
forded to private landowners holding undeveloped forest land.
Similarly, the assessors now argue that Clause Third does not
apply to land conservation organizations like NEFF because the
Legislature intended for The Trustees of Reservations to be the
only private, nonprofit entity permitted to hold conservation
land completely free from property taxes. Neither of these argu-
ments is availing.

a. *General Laws c. 61, "Classification and Taxation of Forest
Land and Forest Products".* General Laws cc. 61, 61A, and
61B, together set forth a reduced-taxation scheme for land
privately held as forest, agricultural, or recreational land. The
assessors argue that the enactment of this statutory scheme
demonstrates a legislative intent to provide for reduced taxation,
but not a complete exemption, for privately held, undeveloped
forest land. Specifically, G. L. c. 61, § 2, permits any private
landowner holding not less than ten acres of land for forest
production to apply to the local board of assessors for a forest-
land classification, which subjects that land to property taxation
at a reduced rate. See G. L. c. 61, §§ 2, 2A; *South St. Nominee
Trust* v. *Assessors of Carlisle,* 70 Mass. App. Ct. 853, 854
(2007). In order to obtain forest-land classification, the land-
owner must implement a forest management plan and submit to
compliance monitoring by the State forester. See G. L. c. 61,
§ 2; *South St. Nominee Trust, supra* at 854-855. The classifica-
tion must be renewed every ten years. G. L. c. 61, § 2. Addi-
tionally, G. L. c. 61 contains provisions discouraging the conver-
sion of the land to another use. For example, if a landowner
wishes to sell the land to a buyer who plans to remove it from
forest-land classification, the sale will be subject to conveyance
taxes based on the total value of the sale of the land. *Id.* at § 6.
However, if the landowner sells the land to the State or munici-
pality, or to a nonprofit conservation organization, no convey-
ance tax is assessed. *Id.* Similarly, if the landowner wishes to
sell the land during a period in which it is classified and taxed
as forest land, the municipality in which the land is located has
a right of first refusal to "meet a bona fide offer" to purchase
the land. *Id.* at § 8. A municipality also may assign this right to
a nonprofit land conservation organization of its choosing. *Id.*

Therefore, G. L. c. 61 creates financial incentives for private landowners to hold land as undeveloped forest land and provides mechanisms to protect forest land from development. The assessors argue that such a result demonstrates that the Legislature could not have intended Clause Third to apply to land conservation organizations because Clause Third does not, by its terms, help to ensure that land is held in its undeveloped state as does G. L. c. 61.

Although Clause Third does not protect land from development, this does not defeat the application of Clause Third to NEFF or any other land conservation organization. General Laws c. 61 and Clause Third serve distinct purposes. General Laws c. 61 is part of a broader statutory scheme animated by conservationist values that expressly creates a program of incentives to encourage conservation by private landowners, whether charitable corporations or otherwise. In contrast, Clause Third does not seek to encourage charitable organizations to pursue particular substantive policy goals or charitable activities. Rather, if a corporation qualifies as a "charitable" enterprise within the meaning of the statute, Clause Third exempts the organization's property from taxation based on the theory that property held for philanthropic, charitable, religious, or other quasi public purposes in fact helps to relieve the burdens of government. *Opinion of the Justices*, 324 Mass. 724, 730-731 (1949). Therefore, a charitable organization makes a sufficient "in-kind" contribution to the community that its property may be exempt from taxation without offending the notions of fairness and proportionality inherent in the system of taxation in the Commonwealth. See *id.* Chapter 61 and Clause Third may overlap in their application to certain taxpayers, but they are components of distinct statutory schemes. Chapter 61 provides a scheme of tax incentives for any nongovernment landowner who holds undeveloped forest land. Clause Third provides a tax exemption for property held by any qualifying charitable organization. Although a particular taxpayer, like NEFF, may be eligible for both of these tax benefits, such overlap does not indicate a legislative intent for one statute to somehow "preempt" the other.

Furthermore, the Legislature has had multiple opportunities

to address the interaction of G. L. c. 61 and Clause Third and never has indicated that the statutes are mutually exclusive. For example, the preamble to G. L. c. 59, § 5, lists certain tax exemptions included in § 5 that may not be combined with other exemptions or tax benefits also included in the section. General Laws c. 59, § 5, Twenty-Sixth, expressly references c. 61. When that clause was added to § 5, the Legislature could have added a reference to it in the preamble of § 5 providing that charitable organizations could not obtain both a property tax reduction under c. 61 and a tax exemption under Clause Third. However, the Legislature chose not to do so. Therefore, G. L. c. 59, § 5, does not contain any express or implied language precluding conservation organizations from seeking the property tax exemption available to eligible charitable organizations under Clause Third.

Similarly, G. L. c. 61 does not contain any express or implied indication that the Legislature intended for c. 61 to preclude land conservation organizations from seeking or qualifying for a property tax exemption under Clause Third. Chapter 61 references expressly "nonprofit conservation organization[s]." G. L. c. 61, §§ 6, 8. Thus, the Legislature considered nonprofit land conservation organizations when it enacted the statute. Yet the Legislature never stated that c. 61 should serve as the only source of a property tax benefit for nonprofit conservation organizations. Indeed references to nonprofit land conservation organizations in c. 61 demonstrate a view of these organizations as assisting municipalities in carrying out the purposes of the statute rather than acting as private landowners who must be encouraged to preserve land in its undeveloped state. Therefore, we conclude that the board erred in holding that c. 61 precludes NEFF from eligibility for a Clause Third property tax exemption.

b. *Statute creating The Trustees of Reservations.* The Trustees of Reservations (Trustees) were established by St. 1891, c. 352, § 1 (Trustees' enabling act) under the name "The Trustees of Public Reservations" for the purpose of "acquiring, holding, arranging, maintaining and opening to the public, under suitable regulations, beautiful and historical places and tracts of land within this Commonwealth." By the express terms of the original statute, lands up to $1 million in value acquired by the Trustees

and kept open to the public in accordance with the statute were exempt from taxation "in the same manner and to the same extent as the property of literary, benevolent, charitable and scientific institutions incorporated within this Commonwealth . . . ."[4] St. 1891, c. 352, §§ 2, 3. The assessors assert that the Legislature's grant within the Trustees' enabling act of a tax exemption for property held by the Trustees demonstrates that the Legislature did not otherwise intend for land privately held for conservation purposes to qualify for a property tax exemption under Clause Third. Rather, the assessors argue, the Legislature intended that the Trustees alone be permitted to hold only a limited amount of Commonwealth land free from taxation for the purposes of conservation.

However, the assessors' arguments disregard the historical context in which the Trustees' enabling act was passed. The Trustees of Reservations was the first land conservation entity of its kind anywhere in the United States. G. Abbot, Saving Special Places: A Centennial History of The Trustees of Reservations 4 (1993). The statute creating the Trustees was inspired by the writings of Charles Eliot who proposed the creation of a board of trustees that would be empowered to hold important parcels of land for preservation and public enjoyment much like The Trustees of the Museum of Fine Arts had been established to "erect[] a museum for the preservation and exhibition of works of art" and the Trustees of the Public Library had been tasked with the "care and control" of the Boston Public Library. St. 1878, c. 114, §§ 1, 5. St. 1870, c. 4, § 1. Hocker, Land Trusts: Key Elements in the Struggle Against Sprawl, 15 Nat. Resources & Env't 244, 244 (2001). Additionally, other statutes establishing nonprofit or benevolent organizations in the same

---

[4]At the time, the statute providing for a property tax exemption for charitable organizations was substantially the same as it is today. Compare St. 1888, c. 158, § 1 (exempting from taxation "[t]he personal property of literary, benevolent, charitable and scientific institutions and temperance societies incorporated within this Commonwealth, and the real estate belonging to [them] occupied by them or their officers for the purposes for which they were incorporated"), with G. L. c. 59, § 5, Third (exempting from taxation "[p]ersonal property of a . . . literary, benevolent, charitable or scientific institution or temperance society incorporated in the commonwealth . . . and real estate owned by or held in trust for a charitable organization and occupied by it or its officers for the purposes for which it is organized").

era also contained language similar to the Trustees' enabling act referencing the general tax exemption for charitable organizations. See, e.g., St. 1882, c. 248, § 3 ("An Act to incorporate the Longfellow Memorial Association"). Consequently, the language treating land acquired by the Trustees as exempt "to the same extent" as land held by other charitable organizations likely demonstrates the Legislature's intent to ensure that organizations like the Trustees were covered by the general charitable tax exemption, not to acknowledge that they were not.

Furthermore, the fact that the Trustees were created by statute does not indicate a legislative intent that they were to serve as the Commonwealth's only land conservation organization. In the 1800s, and even earlier, numerous private charitable organizations were established by statute, including Massachusetts General Hospital and the Museum of Fine Arts, as well as Harvard College, which was established by Colonial charter in 1650. See St. 1870, c. 4 ("An Act to incorporate The Trustees of the Museum of Fine Arts"); St. 1811, c. XCIV ("An Act to incorporate certain persons, by the name of The Massachusetts General Hospital"); The Charter of the President and Fellows of Harvard College (May 31, 1650). None of these statutes purports to establish the *exclusive* hospital, museum, or college in the Commonwealth that may be eligible for a charitable tax exemption.

Additionally, the initial limitation on the total amount of property the Trustees could hold was increased over time, and the limit was eliminated altogether in 1971. See St. 1963, c. 289 (increasing amount of land Trustees could hold to $10 million); St. 1971, c. 819, § 3 (amending G. L. c. 180, § 6, to permit charitable corporations, including Trustees, to hold real and personal property in unlimited amount). Therefore, the limit initially imposed by the Legislature on the amount of Trustee property that may be exempt from taxation cannot be used to support an argument that the Legislature presently intends to limit the amount of tax-exempt conservation land in the Commonwealth. Furthermore, in a context similar to this case, the board has granted the Trustees a property tax exemption under Clause Third, therefore implicitly contradicting the argument that the Legislature intended for the Trustees' enabling act to serve as the exclusive source of a property tax exemption for

conservation land in the Commonwealth. Trustees of Reservations *vs.* Assessors of Windsor, App. Tax Bd., No. 159046 (Dec. 2, 1991).[5] We conclude that neither the Trustees' enabling act, nor the present legal treatment of the Trustees is evidence of a legislative intent to exclude from property tax exemption land conservation organizations that otherwise meet the requirements of Clause Third.

3. *Property tax exemption under G. L. c. 59, § 5, Third.* Clause Third provides an exemption from taxation of real property when such property is held by a "charitable organization" and "occupied by [the organization] or its officers for the purposes for which it is organized." G. L. c. 59, § 5, Third. Qualification for a tax exemption under Clause Third is a two-pronged test. *Mary Ann Morse Healthcare Corp.* v. *Assessors of Framingham*, 74 Mass. App. Ct. 701, 703 (2009). See *Harvard Community Health Plan, Inc.* v. *Assessors of Cambridge*, 384 Mass. 536, 541 (1981). The first requirement is that the organization seeking the exemption qualify as a "charitable" organization within the meaning of Clause Third. *Harvard Community Health Plan, supra.* The second is that the organization occupy the property in furtherance of its charitable purposes. *Id. Mary Ann Morse Healthcare Corp., supra* at 705. Although each prong is closely related, and certain facts may be relevant to both, each requirement should be considered in turn.

Exemption statutes are strictly construed, and the burden lies with the party seeking an exemption to demonstrate that it qualifies according to the express terms or the necessary implication of a statute providing the exemption. *Milton* v. *Ladd*, 348

[5]We stated in *Milton* v. *Ladd*, 348 Mass. 762, 766 (1965), that "[w]e read [the Trustees' enabling act] to provide a somewhat broader exemption . . . than would be available under the general exemption statute." However, in that same decision we immediately went on to acknowledge that the enabling act could likewise be subject to a more narrow interpretation than Clause Third, placing on the Trustees an additional obligation, not required of all charitable organizations, that it make its lands open to the public. In *Ladd*, we did not go so far as to resolve the precise boundaries between Clause Third and the Trustees' enabling act. The holding of *Ladd* was based on an interpretation of the Trustees' enabling act alone. *Id.* Therefore, our statements in *Ladd* do not lend support to the assessors' argument that the Trustees' enabling act somehow demonstrates a legislative intent to preclude conservation organizations from qualifying for a charitable tax exemption under Clause Third.

Mass. 762, 765 (1965), citing *Animal Rescue League of Boston v. Assessors of Bourne*, 310 Mass. 330, 332 (1941). We uphold findings of fact of the board that are supported by substantial evidence. We review conclusions of law, including questions of statutory construction, de novo. *Bridgewater State Univ. Found. v. Assessors of Bridgewater*, 463 Mass. 154, 156 (2012). We conclude that the board erred in denying NEFF a property tax exemption and that NEFF is a charitable organization that, during the relevant tax year, occupied its parcel in Hawley for its charitable purposes within the meaning of G. L. c. 59, § 5, Third.

a. *Charitable purpose requirement.* The text of Clause Third defines a charitable organization as "a literary, benevolent, charitable or scientific institution or temperance society incorporated in the commonwealth" or a trust created for the same purposes. An organization's legal status as a charitable corporation or its exemption from Federal taxation under § 501(c)(3) of the United States tax code is not sufficient to satisfy this requirement. An organization must prove that "it is in fact so conducted that in actual operation it is a public charity." *Western Mass. Lifecare Corp. v. Assessors of Springfield*, 434 Mass. 96, 102 (2001), quoting *Jacob's Pillow Dance Festival, Inc. v. Assessors of Becket*, 320 Mass. 311, 313 (1946).

In the context of the property tax exemption, we have long recognized that "charity" may constitute more than "mere alms giving." *Boston Symphony Orchestra, Inc. v. Assessors of Boston*, 294 Mass. 248, 255 (1936), quoting *New England Sanitarium v. Stoneham*, 205 Mass. 335, 342 (1910). The dominant purpose of a charitable organization must be to perform work for the public good, not merely its own members. *New Habitat, Inc. v. Tax Collector of Cambridge*, 451 Mass. 729, 732 (2008) (*New Habitat*), citing *Massachusetts Med. Soc'y v. Assessors of Boston*, 340 Mass. 327, 332 (1960). As Justice Gray, writing for the court in 1867, stated, in the legal sense, a charity is "a gift, to be applied consistently with existing laws, for the benefit of an indefinite number of persons, either by bringing their minds or hearts under the influence of education or religion, by relieving their bodies from disease, suffering or constraint, by assisting them to establish themselves in life, or by erecting or maintaining

public buildings or works or by otherwise lessening the burdens of government." *Jackson* v. *Phillips*, 14 Allen 539, 556 (1867). See *New Habitat, supra.* This definition describes the "traditional objects and methods of charity." *Id.* The closer an organization's dominant purposes and methods hew to these traditional charitable purposes, the more likely the organization is to qualify as a "charitable organization" under Clause Third. *Id.* at 733. When an organization's dominant purposes are further from these traditionally charitable purposes, additional factors become more significant in determining whether the organization qualifies as charitable within the meaning of the statute.[6]

NEFF's purposes are traditionally charitable within the meaning of Clause Third and the definition of charity set forth in *Jackson, supra.* First, NEFF's charitable programs and activities, both in Hawley and throughout New England, are of the sort that their benefit inures to an indefinite number of people. Historically, the "benefit" provided by land held as open space or in its natural state has been measured by the direct access of people to that land for such purposes as recreation, scenic views, or education. See, e.g., *Holbrook Island Sanctuary* v. *Brooksville*, 161 Me. 476, 486 (1965); *Hawk Mountain Sanctuary Ass'n* v. *Board for the Assessment & Revision of Taxes of Berks County*, 188 Pa. Super. 54, 57 (1958). However, as the science of conservation has advanced, it has become more apparent that properly preserved and managed conservation land can provide a tangible benefit to a community even if few people enter the land. For example, the climate change adaptation advisory committee of the Executive Office of Energy and Environmental Affairs has identified the conservation of large forested blocks of land as an effective means of contributing to "ecosystem resilience" in the face of rising temperatures and more severe

---

[6]The additional factors relevant to this analysis include, but are not limited to, "whether the organization provides low-cost or free services to those unable to pay"; "whether it charges fees for its services and how much those fees are"; "whether it offers its services to a large or 'fluid' group of beneficiaries and how large or fluid that group is"; "whether the organization provides its services to those from all segments of society and from all walks of life"; and "whether the organization limits its services to those who fulfil certain qualifications and how those limitations help advance the organization's charitable purposes." *New Habitat, Inc.* v. *Tax Collector of Cambridge*, 451 Mass. 729, 732-733 (2008).

storms because forests naturally absorb carbon and other harmful emissions.[7] Additionally, open space land naturally absorbs and helps dissipate stormwater runoff without the need for drainage systems that are required in paved and developed areas.[8] Furthermore, forest land helps to clean the air by filtering particulates naturally, and it regulates and purifies the fresh water supply by stabilizing soils that store water over time and filter contaminants.[9] Such benefits may extend beyond the parcel of land itself. Consequently, NEFF's activities are not of the sort that inure only to a limited group of people such as the organization's own members.[10] Contrast Nature Preserve, Inc. *vs.* Assessors of Pembroke, App. Tax Bd., No. F246663, ATB

[7]Executive Office of Energy and Environmental Affairs, Massachusetts Climate Change Adaptation Report 12, 26, 38, 39 (Sept. 2011) (Climate Change Report).

[8]Climate Change Report, *supra* at 34. According to an independent report commissioned by the Trust for Public Land, the city of Boston alone saves approximately $553,000 annually as a result of carbon, sulfur, and ozone absorption by trees and shrubs in city parks. The Trust for Public Land, The Return on Investment in Parks and Open Space in Massachusetts 18 (Sept. 2013) (Return on Investment). Additionally, it is estimated that the city's parks provide natural stormwater retention services valued at $8.67 million annually based on city water management costs. *Id.*

[9]Return on Investment, *supra* at 13.

[10]The Appellate Tax Board has required land conservation organizations seeking a property tax exemption to show that they are a charitable organization under Clause Third by demonstrating that they invite, encourage, and facilitate the entry of the public at large onto their lands. See, e.g., Brookline Conservation Land Trust *vs.* Assessors of Brookline, App. Tax Bd., Nos. 281854-56, 285517-19, ATB 2208-679, 693-695 (June 5, 2008); Forges Farm, Inc. *vs.* Assessors of Plymouth, App. Tax Bd., Nos. F283127, F283128, F283129, ATB 2007-1197, 1205-1206 (Oct. 18, 2007). Although this inquiry may be somewhat useful in seeking to ensure that an organization is a "bona fide" land conservation organization, as opposed to a group organized as a charity that simply is seeking to set aside land for its own private use or as a buffer around members' own private property, we emphasize that public access to the land is not *required* for a nonprofit conservation organization to qualify for a Clause Third exemption provided that the organization can demonstrate that in practice it is an organization carrying out land conservation and environmental protection activities of the sort whose benefits inure to the public at large. We do not propose a precise formula for determining whether an organization is a "bona fide" conservation organization, but factors that may prove relevant could include membership in regional, State or national coalitions of conservation organizations; recognition by government entities or the scientific or academic community as a trusted community resource; partnership with local municipalities in carrying out G. L. cc. 61, 61A, or 61B (such as being selected

2000-796, 797, 799, 807, 811 (Sept. 25, 2000) (denying exemption to organization that held sixty-five acres of forest land on which it conducted no conservation activities but had installed benches, trails, and pond for recreation and meditation and was open only to registered members). Therefore, by holding land in its natural pristine condition and thereby protecting wildlife habitats, filtering the air and water supply, and absorbing carbon emissions, combined with engaging in sustainable harvests to ensure the longevity of the forest, NEFF engages in charitable activities of a type that may benefit the general public.[11] See *Carroll* v. *Commissioner of Corps. & Taxation,* 343 Mass. 409, 413 (1961) ("it is in the general public interest that [the] waste of natural resources be overcome").

Moreover, NEFF's work in Hawley, and throughout Massachusetts, is traditionally charitable in the sense that it assists in lessening the burdens of government. See *New Habitat,* 451 Mass. at 732. Conservation and environmental protection are express obligations of the government in Massachusetts. Article 97 of the Amendments to the Massachusetts Constitution provides a right of the people to "clean air and water, freedom from excessive and unnecessary noise, and the natural, scenic,

by a town or city to exercise its right of first refusal under G. L. c. 61, § 8); ownership of multiple parcels in various locations of a similar ecological sort or of a variety consistent with the organization's stated mission; expertise of staff members in land conservation and environmental initiatives; success in receiving competitive grants from Federal or State agencies; certifications or accreditations from government or other appropriate entities; invitations from policy makers or State agencies to participate in regional or Statewide strategic planning initiatives; or like indicia of the organization's status as a genuine land conservation organization.

[11]Similarly, other jurisdictions have held that land conservation activities can benefit the general public regardless of the public's access to the land itself. For example, the New Mexico Court of Appeals held that a land conservation organization that held land in the Pecos River Canyon in its "natural and undisturbed" state provided a "substantial benefit to the public" through its "environmental preservation and beautification" of the region. Therefore the land qualified for a property tax exemption despite the absence of any evidence that the public used the land for recreation or its own scenic views. Pecos River Open Spaces, Inc. *vs.* County of San Miguel, N.M. Ct. App., No. 30,865, slip op. at 9-10 (Jan. 11, 2013). See *Turner* v. *Trust for Pub. Land,* 445 So. 2d 1124, 1126 (Fla. Dist. Ct. App. 1984) (stating that "[t]here can be little question that conservation serves a public purpose" and concluding that particular parcel served "greatest public good" when it was left entirely undeveloped — without trails, walkways, or educational facilities).

historic, and esthetic qualities of their environment" and identifies as a "public purpose" the government's protection of people in their right to the conservation, development, and utilization of natural resources. Therefore, the safeguarding of natural resources and basic environmental quality in the Commonwealth is a duty of the government. Moreover, in G. L. c. 21A, the Legislature established the Executive Office of Energy and Environmental Affairs (EEA) and within it, among other entities, the Departments of Environmental Protection, Conservation and Recreation, and Fish and Game. G. L. c. 21A, §§ 1, 7. General Laws c. 21, § 2, requires the EEA and its departments to carry out State environmental policy, including the "management of air, water and land resources to assure the protection and balanced utilization of such resources within the commonwealth" and "promot[ing] the perpetuation, extension, and proper management of the public and private forest lands of the commonwealth."

In Hawley, NEFF is acting in a manner that assists the State in achieving its conservation policy goals. The Hawley forest is abutted on two sides by the Kenneth Dubuque Memorial State Forest. By acquiring property that directly abuts the State Forest, NEFF has helped to extend a block of forested land preserved by the State. The preservation of increasingly large and contiguous forested blocks has been identified by the EEA as important to the preservation of species that require a certain amount of continuous area to thrive and to the biodiversity of forest lands more generally.[12] Furthermore, NEFF is committed to managing its forest lands according to many of the same principles that the Department of Conservation and Recreation has set forth for the management of its own forest lands.[13]

More broadly, too, NEFF and other conservation organizations

[12]See Massachusetts Division of Fisheries & Wildlife, Department of Fish & Game, Executive Office of Environmental Affairs, Comprehensive Wildlife Conservation Strategy 15-16 (rev. Sept. 2006).

[13]The Department of Conservation and Recreation seeks to utilize its woodlands to provide, among other objectives, "educational examples of excellent forestry to landowners and the general public," "protect[] forest productivity through sustainable forestry," enhance ecosystem resilience in watershed forests through active management, and produce high-quality, high-value local forest products. See Department of Conservation & Recreation, Landscape Designations for DCR Parks & Forests: Selection Criteria and Management

that align their missions with the conservation goals of the State have been identified as essential partners in Statewide conservation efforts. For example, a number of statutory schemes make nonprofit land conservation organizations the partners of municipalities in conservation and land use programs. See, e.g., G. L. c. 44B, § 12 (a) (permitting municipalities to appropriate funds for purchase of open space "community preservation" lands so long as lands are encumbered by conservation restrictions held by another government entity or nonprofit organization); G. L. c. 184, §§ 31-33 (permitting conservation restrictions to be held by government entity or by charitable corporation or trust with conservationist purpose); G. L. c. 61, § 8 (permitting municipality to assign to nonprofit conservation organization its right of first refusal to purchase land from private landowner intending to remove land from forest classification). Furthermore, the contribution that privately held forest land can make to improving air and water quality and mitigating the effects of erosion, rising temperatures, and other ecosystem disruptions assists the government by reducing the cost associated with safeguarding air and water supplies and responding to the effects of pollution.[14]

Moreover, we are not alone in recognizing conservation organizations as serving a traditionally charitable purpose by lessening the burdens of government. For example, in California, which, like Massachusetts, has a strong public policy in favor of environmental protection, and which has adopted the definition of "charity" first set forth by this court in 1867 in *Jackson*, 14 Allen at 556, at least one appellate court has recognized that property used exclusively as a nature preserve to protect native plants or animals may qualify as charitable because it lessens the government's burden to preserve ecological communities and native flora and fauna. *Santa Catalina Island Conservancy*

---

Guidelines 37 (Mar. 2012). Similarly, NEFF is committed to managing its lands actively as demonstration and educational forests, conserving forest resources through sustainable forestry, increasing the production of timber in an "ecologically and economically prudent manner," and, with regard to the Hawley forest in particular, "[m]aintain[ing] and/or enhanc[ing]" recreational or aesthetic qualities and wildlife habitats, producing income from periodic timber harvests, and managing the timber resource over the long term to produce "high quality saw logs."

[14]See Return on Investment, *supra* at 13, 18.

v. *County of Los Angeles*, 126 Cal. App. 3d 221, 236, 237 (1981). Therefore, because NEFF's stated mission and land conservation activities are of the sort to inure to an indefinite number of people and lessen the burdens of government, NEFF pursues traditionally charitable purposes and activities within the meaning of Clause Third.

b. *Occupancy requirement.* In order to qualify for a charitable tax exemption, NEFF must do more than satisfy the charitable status requirement. It must also show that it "occupies" the Hawley Forest in furtherance of its charitable purposes. G. L. c. 59, § 5, Third. Occupancy is "something more than that which results from simple ownership and possession. It signifies an active appropriation to the immediate uses of the charitable cause for which the owner was organized." *Assessors of Boston* v. *Vincent Club*, 351 Mass. 10, 14 (1966), quoting *Babcock* v. *Leopold Morse Home for Infirm Hebrews & Orphanage*, 225 Mass. 418, 421 (1917). The dominant use of the property must be "such as to contribute immediately to the promotion of the charity and to participate physically in the forwarding of its beneficent objects." *Vincent Club, supra,* quoting *Babcock, supra* at 422. Although extent of use is a factor, it is not decisive. *Vincent Club, supra,* quoting *Babcock, supra* at 421-422. However, if the charitable use of the property is "merely incidental" to a noncharitable use, the property will not be exempt from taxation. See *Boston Symphony Orchestra, Inc.,* 294 Mass. at 257.

We also have held that so long as the property is immediately appropriated to a use that furthers the organization's purposes, the courts shall defer to the organization's officers and directors in determining the extent of property required and the specific uses of the land that will best promote those purposes. *Assessors of Dover* v. *Dominican Fathers Province of St. Joseph*, 334 Mass. 530, 540-541 (1956) (*Dominican Fathers*). The decisions of the organization will be entitled to deference so long as the directors act in good faith and not unreasonably in determining how to occupy and use the property at issue. *Id.* at 541.

The requirement contained in Clause Third that the charity "occupy" the land and the deferential rule set forth in *Dominican Fathers* can best be reconciled by considering the purpose

of Clause Third. See *Bridgewater State Univ. Found.*, 463 Mass.
at 160 & n.10. Clause Third recognizes the contribution a char-
ity makes to the public either on, or through, its use of its
property. Unlike a private landowner whose land ownership
burdens the government by making use of a range of public
services and benefits, the burden a charity's ownership of land
places on the government may be offset by its use of the land in
a manner that benefits the public and lessens the burdens of
government. See *Opinion of the Justices*, 324 Mass. at 730.
Thus, it is fair and proportional to tax privately held land but to
exempt those lands that are held charitably so long as the char-
ity in fact uses the land in a manner that contributes to the com-
munity and reduces the burdens of government. *Id.* at 730-731,
733. The requirement that land be occupied for the organiza-
tion's charitable purposes, then, is best understood as the
Legislature seeking to ensure that the land is not being held as a
private landowner would hold it but that it is being held as an
entity would hold it for the public good.

In the case of open space or conservation land, this inquiry is
complicated by the fact that both private and charitable land-
owners may have an incentive to hold land in an undeveloped
state. See, e.g., G. L. c. 61, §§ 2, 2A (providing reduced taxa-
tion rate for privately owned forest land on application by
landowner). As a result, even after an organization has demon-
strated that it is a bona fide charitable organization within the
meaning of Clause Third, it also must demonstrate that it oc-
cupies the parcel at issue in a manner less like a private landowner
and more like an entity seeking to further the public good.

In the case of NEFF, the board approached this inquiry by
focusing on the degree of public access NEFF encouraged and
achieved at the Hawley forest and concluded that NEFF's promo-
tion of public access was insufficient to demonstrate that it oc-
cupied the land for the benefit of the public. However, Clause
Third does not require imposing an affirmative duty to promote
and facilitate public access on conservation lands in order to
satisfy the occupancy requirement. To impose this sort of duty
exceeds the scope of the inquiry at the core of Clause Third's
occupancy requirement. Additionally, in certain circumstances,
such as in the case of a particularly fragile habitat or ecosystem,

a public access requirement could operate to thwart the very conservation objectives an organization is seeking to achieve. See *Mary Ann Morse Healthcare Corp.*, 74 Mass. App. Ct. at 706 (Clause Third should not be interpreted in manner that results in penalizing organization for pursuing its charitable mission).

Therefore, we conclude that in a case such as NEFF's where the entry of the public onto the land is not necessary for the organization to achieve its charitable purposes, the promotion and achievement of public access is not required to demonstrate occupancy of the land in order to qualify for a Clause Third exemption. The right that is most central to the "bundle" of rights enjoyed by a private property owner is not the freedom from an obligation to invite visitors, it is the affirmative right to exclude others from one's property. *United States* v. *Craft*, 535 U.S. 274, 278 (2002). See *Kaiser Aetna* v. *United States*, 444 U.S. 164, 179-180 (1979) (describing right to exclude as "universally held to be a fundamental element of the property right"). Consequently, the appropriate inquiry begins with whether the entity takes affirmative steps to *exclude* the public from the land, such as through physical barriers, "no trespassing" signs, or actively patrolling the land.

If a charitable organization engages in such exclusion, the organization faces a heightened burden to show that such exclusion of the public is necessary to enable it to achieve its charitable purposes. Although an organization may succeed in meeting this burden, it may do so only by presenting compelling facts demonstrating that the exclusion of the public is necessary to achieve a public benefit through other activities carried out on, or through use of, the land, such as when conservation activities may pose a danger to public safety or where the ecosystem is so fragile that any human presence could undermine the organization's conservation efforts. Such rationales may often be time limited, such as during a timber harvest when trees are being felled or during the nesting period of a vulnerable species. Placing a high burden on organizations that actively exclude the general public from their lands helps to identify and exclude from exemption those land conservation organizations that treat their land more as a private club or a buffer zone around

the private property of organization insiders. However this require-
ment also acknowledges that in particular circumstances the ex-
clusion of the public from the land may be necessary for a bona
fide land conservation organization to carry out its mission and
therefore should not per se preclude an organization from otherwise
demonstrating that it occupies the land.

Here, the evidence presented to the board demonstrated that
NEFF did not take active steps to exclude the public from its
land during the tax year in question. Rather, it took steps to
inform the public that the land is available for recreation, and it
permits the land's regular use by a snowmobiling club and
keeps the land open for hiking and hunting. If NEFF's only
claimed charitable purpose were recreational or educational, it
may have had to demonstrate more regular use of the land for
recreation or education in order to carry its burden to show that
the land was appropriated immediately to its charitable purposes.
See, e.g., *Wheaton College* v. *Norton*, 232 Mass. 141, 148-149
(1919) (granting exemption to "wild woodland" owned by col-
lege where paths through woods were "favorite walks" of pupils
and thereby important to health and enjoyment of students and
essential to college's accomplishment of its charitable purposes).
However, NEFF's charitable purposes also involve the conserva-
tion of forest land through sustainable forestry practices along
with the enhancement of environmental quality through the
promotion of improved water quality and biodiversity. NEFF
presented evidence that it engages in sustainable forestry practices
at appropriate intervals in the Hawley forest, and that the Haw-
ley forest serves as a location where NEFF can track the effects
of its land management. Additionally, NEFF produces a range
of awareness-raising materials and holds conferences and
continuing education programs for foresters regarding sustain-
able forestry practices to educate even those who may not enter
a NEFF property to view it pre- or postharvest. Further, the fact
that the Hawley forest directly abuts a State forest on two sides
promotes biodiversity by extending the habitat area for species
in the State forest. The fact that the Hawley forest abuts the
State forest, rather than the private property of organization
insiders, also tends to show that NEFF occupies the land in
furtherance of its charitable purposes, and not merely to create a

buffer zone around private land. Furthermore, on acquiring the Hawley forest, NEFF not only immediately placed the land under a forest management plan, but also hired an outside forestry consulting firm, rather than having one of the licensed foresters on its own staff develop the plan. This also tends to show that NEFF immediately appropriated the land in furtherance of its conservation goals and did not implement a forest management plan merely for the purposes of a tax reduction under G. L. c. 61, §§ 2, 2A. Consequently, where NEFF does not exclude the public from its land and offered evidence demonstrating how NEFF uses the land as a site on which it carries out sustainable forestry practices, the board erred in concluding that NEFF did not meet its burden to show that it occupied the Hawley forest within the meaning of Clause Third.

4. *Conclusion.* For the foregoing reasons, the decision of the board is reversed.

*So ordered.*