NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

SJC-13287

 JAMES J. REAGAN, JR., & another[1] vs.  COMMISSIONER OF REVENUE.


          Suffolk.      December 5, 2022. - March 10, 2023.

   Present:  Budd, C.J., Gaziano, Lowy, Cypher, Kafker, Wendlandt,
                        & Georges, JJ.


Urban Redevelopment Corporation.  Taxation, Urban redevelopment
     corporation, Capital gain, Exemption, Appellate Tax Board:
     findings.  Statute, Construction.  Administrative Law,
     Agency's interpretation of statute.



     Appeal from a decision of the Appellate Tax Board.

     The Supreme Judicial Court on its own initiative
transferred the case from the Appeals Court.


     Richard L. Jones (Caroline A. Kupiec also present) for the
taxpayers.
     Celine E. de la Foscade-Condon for Commissioner of Revenue.
     Karen A. Pickett & Daniel B. Winslow, for New England Legal
Foundation, amicus curiae, submitted a brief.
     Frank J. Bailey, John C. La Liberte, & Selena Fitanides,
for PioneerLegal, LLC, amicus curiae, submitted a brief.


---

     [1] Irene M. Reagan.

WENDLANDT, J.  "There are three things that matter in property:  location, location, location."[2]  Starting in the 1940s, however, as the Legislature sought to remedy the public exigency of blighted, decadent, and substandard areas in the Commonwealth's cities and towns, location was not enough; the Legislature concluded that it needed to provide an incentive for private investment in urban redevelopment projects to transform the landscape of the Commonwealth and to supply urgently needed low income housing.  Thus, the Legislature enacted and amended G. L. c. 121A.

Pertinent to the present appeal, the statute provides a tax exemption as an incentive for private entities to invest in constructing, operating, and maintaining urban redevelopment projects in areas that have become deteriorated, unsightly, and often dangerous.  The tax concession, which can be extended for up to forty years, see note 5, infra, provides that these private entities are exempt "from taxation of real and personal property and from betterments and special assessments and from the payment of any tax, excise or assessment to or for the

---

[2] This expression has been attributed, perhaps apocryphally, to Lord Harold Samuel, a real estate tycoon in Great Britain. Safire, Location, Location, Location, N.Y. Times Magazine (June 26, 2009) (noting 1926 real estate classified advertisement in Chicago Tribune stating, "Attention salesmen, sales managers: location, location, location, close to Rogers Park," was published at time when young Lord Samuel was only fourteen years old).

[C]ommonwealth or any of its political subdivisions on account of a project" (emphasis added).  G. L. c. 121A, § 18C (f).  In consideration of this tax concession, the tax-exempt entity is required, inter alia, to pay a specifically defined excise annually, to agree to certain restrictions set forth by local housing authorities, to limit its cumulative annual return on investment, and to make additional payments to local authorities.  G. L. c. 121A, § 18C.

This case presents the question whether, when an otherwise qualifying entity sells an urban redevelopment project during the forty-year tax-exempt window, the tax concession extends to the capital gain from the sale.  In other words, we must determine whether a tax on such a capital gain is a tax "on account of" the project.  Concluding that it is and that it thus falls under the tax concession, we reverse the decision of the Appellate Tax Board (board) to the contrary.[3]

1.  Background.  The following facts are taken from the parties' undisputed statement of facts and the exhibits attached thereto.

a.  The limited partnership interests.  The taxpayer James J. Reagan, Jr., was the sole beneficiary of Newbury Realty Trust, which held a minority interest in three limited

---

[3] We acknowledge the amicus briefs submitted by the New England Legal Foundation and PioneerLegal, LLC.

partnerships -- St. James Company (St. James), Blackstone Company (Blackstone), and Kenmore Abbey Limited Partnership (Kenmore Abbey) (collectively, c. 121A partnerships) -- each of which owned, operated, and maintained an urban redevelopment project undertaken pursuant to G. L. c. 121A, § 18C.  Newbury Realty Trust was a nominee trust that was disregarded for Federal and Massachusetts tax purposes; accordingly, Reagan was treated as the direct owner of the three limited partnership interests.

b.  The urban redevelopment projects.  For nearly forty years, and with the approval of the then-named Boston Redevelopment Authority (BRA),[4] the c. 121A partnerships invested over $45 million to acquire blighted properties and to construct, operate, and maintain urban redevelopment projects in Boston (city) pursuant to G. L. c. 121A (c. 121A projects). Specifically, St. James transformed an abandoned and structurally unsound eight-story building in Boston's South End district into 193 dwelling units devoted to elderly housing. Blackstone redeveloped a long-abandoned school property in Boston's West End section into 145 residential units devoted to affordable housing and housing designated for the elderly and

---

[4] The BRA was renamed the Boston Planning and Development Agency in September 2016.  Marchese v. Boston Redev. Auth., 483 Mass. 149, 150 n.1 (2019).

individuals with disabilities.  Kenmore Abbey transformed two vacant hotels on Commonwealth Avenue and Kenmore Street in Boston into 199 residential rental units for the elderly and individuals with disabilities, and approximately 12,000 square feet of commercial space.  For each c. 121A partnership, the c. 121A project constituted its sole asset; the c. 121A partnerships conducted no activities unrelated to their respective c. 121A projects.

Each of the c. 121A projects was approved by the city -- in 1975 for St. James, in 1977 for Blackstone, and in 1982 for Kenmore Abbey -- for a forty-year term[5] pursuant to a G. L. c. 121A, § 6A, contract with the city[6] and a G. L. c. 121A, § 18C, regulatory agreement (§ 18C regulatory agreement) with

---

[5] Pursuant to G. L. c. 121A, § 10, urban redevelopment corporations organized pursuant to G. L. c. 121A, § 3 (§ 3 corporations), and G. L. c. 121A, § 18C, entities (§ 18C entities, and together with § 3 corporations, c. 121A entities) are exempt from taxes for fifteen years, but the exemption is extendable to up to forty years, in the aggregate.

[6] General Laws c. 121A, § 6A, provides that when a c. 121A entity determines to carry out an approved urban redevelopment project, it shall contract to carry out the project with the municipality in which the project is to be situated.  The c. 121A entity may also contract to pay the city or town an amount in addition to the excise prescribed by G. L. c. 121A, § 10, see note 8, infra.  General Laws c. 121A, § 6A, further provides:  "All amounts payable, in addition to the [c. 121A] excise . . . , pursuant to a contract or agreement executed under this section shall be in lieu of taxes assessed and levied upon the [c. 121A entity's] real and personal property."

the BRA.[7]  Each c. 121A partnership agreed to pay an annual excise pursuant to G. L. c. 121A, § 10 (c. 121A excise),[8] and also agreed to make additional annual payments to the city. Furthermore, pursuant to their § 18C regulatory agreements with the BRA, St. James's cumulative annual return on investment was limited to six percent; and each of Blackstone's and Kenmore Abbey's cumulative annual returns on investment was limited to eight percent.[9]

---

[7] General Laws c. 121A, § 18C (c), requires § 18C entities to "agree by regulatory agreement entered into with the department of housing and community development, or in Boston with the [BRA], as to financing the cost of the project."

[8] General Laws c. 121A, § 10, provides, in relevant part, that a c. 121A entity shall annually pay, in addition to certain other excises not relevant to this appeal, the c. 121A excise, which is either a minimum defined amount or, if greater:

> "an excise equal to the sum of the following:  namely, an amount equal to five per cent of its gross income in such preceding calendar year, from all sources, and an amount equal to ten dollars per thousand upon the . . . fair cash value . . . of all real and tangible personal property of such corporation."

"Gross income" is defined as "payments actually made by persons for the right to reside in or occupy any portion or all of the project."  G. L. c. 121A, § 10.  Essentially, the c. 121A excise comprised one percent of the valuation of the c. 121A project plus five percent of the rental income.

[9] Pursuant to G. L. c. 121A, § 18C (e), to be eligible for G. L. c. 121A tax-exempt status, partnerships cannot "receive or accept as net income from a project any sum in excess of eight per cent of the amount invested by them in such project for each year in which they own or have owned the project."  Until an amendment was enacted in 1975, the cumulative annual return on

The c. 121A partnerships paid the c. 121A excise, as well as the additional payments to the city, for each year they owned and carried out their respective c. 121A projects, including for 2012 (the tax year at issue).

c. The property transfers. In the tax year at issue, as the tax-exempt period neared the end of the approved forty-year term, the c. 121A partnerships sold their respective c. 121A projects pursuant to G. L. c. 121A, § 11, to unrelated buyers. An application was submitted to the BRA requesting permission for each proposed sale. The applications specified that upon transfer, the buyers would be required to continue to operate the c. 121A projects, pursuant to the same restrictions as had applied to the c. 121A partnerships. The BRA approved the transfers, as did the mayor of Boston.

The buyer of each c. 121A project entered into a G. L. c. 121A, § 6A, contract with the city and a § 18C regulatory agreement with the BRA. Upon the transfer, each new owner continued operating their respective c. 121A project.

Following the sales, each c. 121A partnership distributed to Reagan his distributive share of the sale proceeds.

d. The Reagans' 2012 tax filings. Reagan and his wife, Irene M. Reagan, reported the capital gains from the sales of

investment was capped at six percent. See St. 1975, c. 827, § 16.

the c. 121A projects in their 2012 Federal income tax return. The Reagans submitted their 2012 Massachusetts income tax return, which reflected no taxable income from the c. 121A partnerships. The Reagans disclosed their distributive share of the capital gains in their Massachusetts filing, but they did not include it in their total taxable capital gains, taking the position that the gains were exempt from tax under G. L. c. 121A, § 18C (f), because the gains were "on account of" the c. 121A projects.

In March 2016, the Commissioner of Revenue (commissioner) issued a notice of assessment to the Reagans related to their capital gains from the sales of the c. 121A projects, and in March 2017, denied the Reagans' application for abatement.

The Reagans timely appealed to the board. The Reagans and the commissioner submitted a statement of agreed facts to the board. In July 2020, the board issued a decision upholding the assessment; and in August 2021, the board issued its findings of fact and report. The Reagans timely appealed, and we transferred the case to this court sua sponte.

2. Discussion. To determine whether the tax exemption applies to the capital gains on the sales of the c. 121A projects, we must determine whether imposing a tax on the capital gain realized from the sale of a c. 121A project is a

tax "on account of" a project as that phrase is used in G. L. c. 121A, § 18C (f).

a. Standard of review. "We review conclusions of law, including questions of statutory construction, de novo." New England Forestry Found., Inc. v. Assessors of Hawley, 468 Mass. 138, 149 (2014).

> "In doing so, the general and familiar rule is that a statute must be interpreted according to the intent of the Legislature ascertained from all its words construed by the ordinary and approved usage of the language, considered in connection with the cause of its enactment, the mischief or imperfection to be remedied and the main object to be accomplished, to the end that the purpose of its framers may be effectuated" (quotation and alteration omitted).

Oracle USA, Inc. v. Commissioner of Revenue, 487 Mass. 518, 522 (2021), quoting Commissioner of Revenue v. Gillette Co., 454 Mass. 72, 76 (2009).

Where, as here, we are asked to construe the scope of a tax exemption, we are guided by the principle that "an exemption from taxation 'is a matter of special favor or grace,' and . . . statutes granting exemptions from taxation are therefore to be strictly construed." South Boston Sav. Bank v. Commissioner of Revenue, 418 Mass. 695, 698 (1994), quoting State Tax Comm'n v. Blinder, 336 Mass. 698, 703 (1958). An exemption is "to be recognized only where the property falls clearly and unmistakably within the express words of a legislative command." Blinder, supra. "The burden is on the taxpayer to demonstrate

entitlement to an exemption claimed." South Boston Sav. Bank, supra.

"We defer to the board's expertise with respect to the interpretation of tax laws in the Commonwealth." U.S. Auto Parts Network, Inc. v. Commissioner of Revenue, 491 Mass. 122, 127 (2022), quoting VAS Holdings & Invs. LLC v. Commissioner of Revenue, 489 Mass. 669, 674 (2022). See Oracle USA, Inc., 487 Mass. at 522, quoting Shaffer v. Commissioner of Revenue, 485 Mass. 198, 203, cert. denied, 141 S. Ct. 819 (2020) ("[B]ecause the board is an agency charged with administering the tax law and has expertise in tax matters, we give weight to its interpretation of tax statutes"). If the board's construction of a tax law "is reasonable, we will defer to its interpretation." Oracle USA, Inc., supra.

"At the same time, principles of deference are not principles of abdication; '[t]he proper interpretation of a statute is a question of law for us to resolve.'" Oracle USA, Inc., 487 Mass. at 522, quoting Gillette Co., 454 Mass. at 76. "Board decisions will be set aside for an error of law." VAS Holdings & Invs. LLC, 489 Mass. at 674. Where the taxpayer meets it burden to show entitlement to a tax concession, we will reverse a decision of the board denying an exemption. See, e.g., New England Forestry Found., Inc., 468 Mass. at 159 (board erred in concluding that forest property owned by nonprofit was

not tax exempt from property tax where nonprofit carried its burden to show it occupied land for charitable purpose).

b. Plain language. We begin with the "ordinary and approved usage of the language" of the statute. Oracle USA, Inc., 487 Mass. at 522, quoting Gillette Co., 454 Mass. at 76. General Laws c. 121A, § 18C (f), exempts G. L. c. 121A, § 18C, entities (§ 18C entities) "from taxation of real and personal property and from betterments and special assessments and from the payment of any tax, excise or assessment to or for the [C]ommonwealth or any of its political subdivisions on account of a project" (emphasis added). The ordinary meaning of the phrase "on account of" is "because of." Random House Dictionary of the English Language 10 (1973) (defining "on account of" as "by reason of" and "because of"); Merriam-Webster Online Dictionary, https://www.merriam-webster.com/dictionary/account [https://perma.cc/WEC4-2UMP] (same). "On account of" requires a causal connection "between the term that the phrase 'on account of' modifies and the factor specified in the statute at issue." Rousey v. Jacoway, 544 U.S. 320, 326 (2005). See Gross v. FBL Fin. Servs., Inc., 557 U.S. 167, 176 (2009) (using "on account of" synonymously with "because of"). Accordingly, the plain meaning of G. L. c. 121A, § 18C (f), exempting a qualifying entity from "any" tax "on account of" a project, is a tax

concession for any taxes causally connected to the project.  See

Rousey, supra.

Capital gain falls within this provision; plainly, the gain

is causally related to the project.[10]  Contrary to the board's

conclusion, this determination is supported by the definition of

the term "project."  The statute defines "project" as:

> "any undertaking consisting of the construction in a
> blighted open, decadent or sub-standard area of . . .
> residential, commercial, [or other] buildings . . . and the
> operation and maintenance of such buildings . . . after
> construction . . . [and] may include as incidental thereto
> . . . acquisition and assembly of the land (and buildings
> and structures and other improvements thereon, if any)
> within a blighted open, decadent or sub-standard area."

G. L. c. 121A, § 1.  Consistent with this definition, the c.

121A partnerships each "acqui[red]" property in an area that had

been blighted, decadent, and substandard.  Each c. 121A

partnership invested in the "construction" of buildings on those

acquired properties.  Thereafter, each c. 121A partnership

"operat[ed]" and "maint[ained]" such buildings.  Indeed,

---

[10] Contrary to the commissioner's argument, this
construction is supported by O'Gilvie v. United States, 519 U.S.
79 (1996), in which the United States Supreme Court concluded,
as we do here, that "on account of" means "for the sake of:  by
reason of:  because of."  Id. at 83, quoting Webster's Third New
International Dictionary 13 (1981).  Because the punitive
damages in that case were not "'received . . . on account of'
the personal injuries, but rather were awarded 'on account of' a
defendant's reprehensible conduct and the jury's need to punish
and to deter it," they fell outside of the tax exemption there
at issue.  O'Gilvie, supra.

although not required by the statute, for each c. 121A partnership, the c. 121A project was its sole asset.

As a result of these investments in the c. 121A projects over the course of nearly four decades, the value of the properties in the formerly blighted areas increased.  This increased value is reflected in the capital gain.  In other words, the capital gain -- the increased value -- was causally related to the project -- the "acquisition," "construction," "operation," and "maintenance" efforts of the c. 121A partnerships.  See G. L. c. 121A, § 1.  Thus, despite the canon of statutory construction requiring us to construe tax concessions narrowly, see South Boston Sav. Bank, 418 Mass. at 698, here the Legislature's choice of the phrase "on account of" requires the construction we adopt.

c.  Statutory framework.  The conclusion that the tax exemption extends to the capital gain from the sale of a c. 121A project is buttressed by the statute as a whole.  See City Elec. Supply Co. v. Arch Ins. Co., 481 Mass. 784, 790 (2019), quoting LeClair v. Norwell, 430 Mass. 328, 333 (1999) ("[w]hen the meaning of a statute is brought into question, a court properly should read other sections and should construe them together").  See also Plymouth Retirement Bd. v. Contributory Retirement Appeal Bd., 483 Mass. 600, 605 (2019) ("Beyond plain language, courts must look to the statutory scheme as a whole, so as to

produce an internal consistency within the statute.  Even clear statutory language is not read in isolation" [quotations, citations and alteration omitted]); Commonwealth v. Morgan, 476 Mass. 768, 777 (2017) ("The plain language of the statute, read as a whole, provides the primary insight into that intent. . . . We do not confine our interpretation to the words of a single section").

In particular, the Legislature confirmed its choice to grant a broad tax concession by codifying its intent in the statute itself.  See Brookline v. Commissioner of the Dep't of Envtl. Quality Eng'g, 398 Mass. 404, 412 (1986) (court may consider codified intent as part of statute as whole where it does not conflict with more specific provisions).  Specifically, G. L. c. 121A, § 2, sets forth the Legislature's finding that "blighted open, decadent or sub-standard areas" comprised a "growing menace, injurious . . . to the safety, health, morals and welfare of the residents of the [C]ommonwealth."  The Legislature also acknowledged that, particularly in areas where blight existed, there was a shortage of "decent, safe and sanitary buildings" for residential and other purposes.  Id. The Legislature further found that this "menace" could not be remedied solely by the Commonwealth's regulatory police powers and that it could not "be dealt with effectively by the ordinary operations of private enterprise without the aids" provided in

G. L. c. 121A.  Id.  Accordingly, the Legislature intended G. L. c. 121A to

> "stimulate the investment of private capital in blighted open, decadent or sub-standard areas, and in the construction, maintenance and operation in such areas of needed decent, safe and sanitary residential, commercial, industrial, institutional, and recreational buildings; . . . the construction, maintenance and operation of such buildings on such land in such areas will assist in achieving permanent and comprehensive elimination of existing slums, and sub-standard, decadent and blighted conditions and in preventing the recurrence or redevelopment of such conditions."

Id.  In sum, the statute sets forth the Legislature's intent to provide a significant incentive to spur private investment to transform blighted areas of the Commonwealth's cities and towns, and to build sorely needed low income housing,[11] to remedy a

---

[11] The statute has encouraged private development of affordable housing:

> "The most frequent application of Chapter 121A has been in the construction of housing for low and moderate income families.  Approximately [ninety-four percent] of all Chapter 121A projects developed to date have been residential. . . .

> "Chapter 121A is designed to stimulate development in Massachusetts by making tax payments on eligible investments both predictable and affordable.  Tax agreements are established to assure the feasibility of certain desirable projects.  They are negotiated to compensate for the state's over-reliance on the property tax, and to provide the tax predictability which is necessary for major investments under certain circumstances."

Executive Office of Communities & Development, Chapter 121A:  A Handbook for Local Officials 3 (Nov. 1979).

situation that had become a public exigency, which the Commonwealth's police powers alone could not solve and which was not being addressed by operation of the private marketplace in the absence of such an incentive.  See Boston Edison Co. v. Boston Redev. Auth., 374 Mass. 37, 45 (1997), citing G. L. c. 121A, § 2 ("Chapter 121A was enacted in response to a legislative determination that the continued existence of blight and decay posed a threat to the health and safety of the inhabitants of the Commonwealth.  The Legislature concluded that such conditions constituted a public exigency and that their elimination would be in the public interest").

Yet, other than the tax concession, the statute provides little to entice private entities to invest in c. 121A projects, which by necessity are highly regulated.  See, e.g., G. L. c. 121A, § 3 (project must be "authorized and approved by the Boston Redevelopment Authority" or local housing board); G. L. c. 121A, § 5 (application must specify, inter alia, "the reasons why the project is necessary or desirable [and] the uses to which the project is to be put," and include site plan); G. L. c. 121A, § 6A (G. L. c. 121A, § 3, corporations [§ 3 corporations] and § 18C entities [together, c. 121A entities] must contract with city or town "for the carrying out of such project in accordance with the application, the provisions of [G. L. c. 121A], and the rules, regulations and standards

prescribed by the housing board for such project"); G. L. c. 121A, § 18C (e) (requiring regulatory agreement with BRA and compliance with inspections and financing regulations).

Indeed, despite the tax exemption, c. 121A entities are not unencumbered by payments to the Commonwealth. Significantly, in consideration of the tax concession, c. 121A entities must pay, in addition to other excises, the c. 121A excise, calculated based on a formula that considers the entity's annual rental income as set forth in G. L. c. 121A, § 10. See note 8, supra. Also, local authorities can require that the entities "pay to the city or town with respect to one or more years such specific or ascertainable amount in addition to the [c. 121A] excise . . . as may have been stated in the application." G. L. c. 121A, § 6A. See note 6, supra. Further, the statute caps the cumulative annual return on investment at eight percent. G. L. c. 121A, § 18C (e). See note 9, supra.

These other limiting provisions of the statute bolster our construction of the tax concession and, particularly, of the term "on account of" in order to achieve the codified intent to "stimulate the investment of private capital in blighted open, decadent or sub-standard areas," and to encourage the "construction, maintenance and operation in such areas of needed decent, safe and sanitary residential, commercial, industrial, institutional, and recreational buildings." G. L. c. 121A, § 2.

One of the most effective "aids" provided in G. L. c. 121A, to "stimulate the investment of private capital" is the tax exemption.[12]  G. L. c. 121A, § 2.  See Dodge v. Prudential Ins. Co. of Am., 343 Mass. 375, 383-384 (1961), quoting Opinion of the Justices, 341 Mass. 760, 778 (1960) ("since 'urban redevelopment corporations, although in a sense private corporations, perform functions for the public benefit analogous to those performed by various other types of corporations commonly called public service corporations, property owned by them and used in such service may receive favored treatment in the matter of taxation'").  See also Boston Edison Co., 374 Mass. at 50 (because c. 121A projects "serve public purposes," they "are subsidized by grants of tax concessions").  Achieving a capital gain from the sale of a c. 121A project is often a significant driver for real estate investors;[13] construing "on account of" to extend to the capital gain from the sale of a project thus not only falls within the broad language the Legislature chose for the tax concession, but is supported by the statute's "main object" to spur private investment in

---

[12] Chapter 121A also provides tax predictability.  See note 11, supra.

[13] See generally A. Baum & D. Hartzell, Global Property Investment:  Strategies, Structures, Decisions xi (2012) (real estate investors are generally driven by ability to "earn income from rents and from selling the asset at the end of a holding period for more than they paid for it").

blighted areas.  See Oracle USA, Inc., 487 Mass. at 522, quoting Gillette Co., 454 Mass. at 76.

d.  Legislative history.  Given the unambiguous meaning of "on account of," we need not examine the provision's history. See Osborne-Trussell v. Children's Hosp. Corp., 488 Mass. 248, 254 (2021), quoting Doherty v. Civil Serv. Comm'n, 486 Mass. 487, 491 (2020) ("If the statutory language is clear, 'courts must give effect to its plain and ordinary meaning and need not look beyond the words of the statute itself'").  Nevertheless, it is notable that the breadth of the tax exemption contemplated finds further support in the statute's legislative history.  In its original form, G. L. c. 121A provided that c. 121A projects could be carried out only by § 3 corporations.  St. 1945, c. 654.  Such corporations are created "for the purpose of carrying out a project authorized and approved, or to be authorized and approved, by the housing board," and cannot "undertake more than one project."  St. 1945, c. 654, § 3.  The statute initially exempted such corporations only from property taxes.  See St. 1945, c. 654, § 10 ("The real estate and personal property of any such corporation shall for a period of forty years after its organization be exempt from taxation under [G. L. c. 59]").

In 1956, with blight persisting, the Legislature amended the statute to expand the tax benefits for § 3 corporations.  It

provides that, for the exemption period, the corporations "shall be exempt from taxation and from betterments and special assessments; and . . . shall not be required to pay any tax, excise or assessment to or for the [C]ommonwealth or any of its political subdivisions," except for the c. 121A excise and certain other excises, if applicable.[14]  St. 1956 c. 640, § 4.

In 1965, the Legislature recognized that the statute did not foster incentive sufficient to lure private investment in addressing the problem of blight.  Accordingly, it again expanded the reach of the statute, amending G. L. c. 121A to extend the tax advantages previously provided only to § 3

---

[14] In 1956, the House of Representatives asked the Justices of this court to determine whether it was

"within the competency of the General Court . . . to enact a law exempting urban redevelopment corporations and their property, including certain leased property, from taxation, betterments and special assessments for a period of forty years after their organization, and providing that during said period such corporations shall pay no tax, excise or assessment, except a corporate excise and certain other excises."

Opinion of the Justices, 334 Mass. 760, 761 (1956).  The Justices answered in the affirmative.  Id. at 764.  The Justices again addressed similar questions regarding amendments in 1960 pertaining to, inter alia, whether a particular redevelopment project should qualify as an urban redevelopment project, in Opinion of the Justices, 341 Mass. 760, 770 (1960).  The Justices concluded that if "each project is properly found (in accordance with [G. L. ]c. 121A as amended by the bill) to be for a public purpose," then yes, it was within the competency of the Legislature to exempt qualifying projects, as redefined in the proposed bill, from taxation.  Id. at 780.

corporations to § 18C entities.  See G. L. c. 121A, § 18C, inserted by St. 1965, c. 859, § 1.  Specifically, the Legislature allowed "[i]ndividuals, and associations of persons organized in the [C]ommonwealth in the form of joint ventures, partnerships, limited partnerships or trusts, resident or organized in the [C]ommonwealth, or charitable corporations" to "undertake projects . . . or acquire a project which has been authorized and approved and which has been developed or is being developed."  Id.

 However, unlike § 3 corporations, whose sole business is cabined to activities related to c. 121A projects, the Legislature permitted § 18C entities to undertake business and activities other than c. 121A projects.  Compare G. L. c. 121A, § 3 ("No [§ 3] corporation shall undertake more than one project or engage in any other type of activity"), with G. L. c. 121A, § 18C (providing no similar restriction on business activities of § 18C entities).  Accordingly, the Legislature provided that § 18C entities would enjoy the same tax concession as § 3 corporations, but only to the extent of their G. L. c. 121A business activities.  G. L. c. 121A, § 18C (f).  Other business activities of such entities -- their non-G. L. c. 121A activities -- do not enjoy the G. L. c. 121A tax exemption; to accomplish this end, the Legislature limited the exempt

activities to those "on account of" -- i.e., causally related to -- urban redevelopment projects.[15]

In 1975, the Legislature again expanded the incentives available to c. 121A entities, by enacting G. L. c. 121A, § 18D, to permit the construction and sale of residential condominium units within c. 121A projects.  St. 1975, c. 827, § 19.  The amendment extends, for a limited duration, certain benefits, including the tax concession, to purchasers of condominium units within c. 121A projects, "as an additional means of stimulating the investment of private capital in" blighted areas.  G. L. c. 121A, § 18D.

In sum, the legislative history of G. L. c. 121A evinces an intent to spur private entities to invest in urban redevelopment projects by expanding the available tax exemption, which is consistent with our construction of "on account of" to include the capital gain from the sale of a project.

e.  Board's analysis.  Passing over the plain language and legislative history, the board rested its conclusion that the capital gain from the sale of a c. 121A project did not fall

_____

[15] By contrast, the "on account of" language was unnecessary for § 3 corporations, whose sole business are projects under G. L. c. 121A, § 3.  Consequently, the Legislature did not use the "on account of" language in setting forth the tax exemption for § 3 corporations.  See G. L. c. 121A, § 10 ("such corporation shall not be required to pay any tax, excise, or assessment to or for the [C]ommonwealth or any of its political subdivisions").

within the tax concession on three grounds:  (1) that the capital gain was realized after the sale of the projects when, the board contended, the c. 121A partnerships were no longer eligible for the tax concession; (2) that the expansion of the tax exemption to condominium owners and the required use of the profits from such sales to create a guaranty fund evinced the legislative intent to preclude capital gain from the tax exemption, see G. L. c. 121A, § 18D; and (3) that it was required in deference to the commissioner's Letter Ruling 94-7 (Oct. 4, 1994).

i.  Timing of capital gain.  The board principally relied on the observation that after a § 18C entity sells the project, it can no longer derive rental income from the project, and thus it is no longer entitled to the privilege of the tax concession. Reagan vs. Commissioner of Revenue, Appellate Tax Bd., No. C332548, ATB 2021 at 221-222 (Aug. 18, 2021).  While the board's observation is true,[16] its conclusion that capital gain is not "on account of" a project is a non sequitur.

---

[16] General Laws c. 121A, § 18C, provides that once c. 121A entities have "carried out their obligations and performed their duties as imposed by" G. L. c. 121A for the tax-exempt period, the entities "shall thereafter no longer be subject to the obligations of this chapter . . . nor shall they enjoy the rights and privileges hereby granted."  See G. L. c. 121A, § 16 (equivalent provision for § 3 corporations).  The board maintained that the tax exemption is one of the "rights and privileges" that terminates once the c. 121A entity is no longer a c. 121A entity.  This is true but inapposite.  As discussed

The board's conclusion seems to rest on a misapprehension -- namely, that capital gain is realized after the project is sold.[17]  To the contrary, capital gain is realized coincident with the sales transaction; it is, by definition, "[t]he profit realized when a capital asset is sold or exchanged" (emphasis added).[18]  Black's Law Dictionary 259 (11th ed. 2019).  See

_____

supra, each c. 121A partnership performed its duties until the sale, at which time it simultaneously realized the capital gain at issue.

   Similarly, the board's observation that the c. 121A partnerships no longer derived rental income from the c. 121A projects following the sale of the projects is true but inapposite.  General Laws c. 121A, § 18C (f), contemplates a quid pro quo -- namely, that "in consideration" of the tax exemption, entities carrying out c. 121A projects will pay the c. 121A excise.  The parties do not dispute that the c. 121A partnerships complied with their G. L. c. 121A obligations, including for the tax year at issue; in particular, the c. 121A partnerships paid the c. 121A excise based on, inter alia, rental income, see note 8, supra.

   [17] At oral argument, counsel for the commissioner acknowledged that capital gain is realized "actually simultaneous[ly]" with a sale.

   [18] "Property is generally treated as acquired and disposed of when title passes or the benefits and burdens of ownership are transferred, whichever occurs first."  4 Mertens Law of Fed. Income Taxation § 22:18 (2021).  Capital gain is measured as of the sale date, confirming that it is realized simultaneously with, not after, the sale of a capital asset.  See id., citing Fogel v. Commissioner of Internal Revenue, 203 F.2d 347, 349 (5th Cir. 1953); Rev. Rul. 70-598, 1970-2 C.B. 168 (in determining period for which asset has been held, taxpayer's holding period generally begins on day after date that property was acquired and generally ends on date of disposition).  See also Rev. Rul. 54-607, 1954-2 C.B. 177 ("In determining the holding period for capital gain and loss purposes, the date the

Minkin v. Commissioner of Revenue, 425 Mass. 174, 180 (1997)
(capital gain is realized "when the . . . property is liquidated
at a profit"); id. (transferor realizes "a capital gain . . . on
the sale" [emphasis added]); Johnson v. Department of Revenue,
387 Mass. 59, 65 (1982) ("capital gain was realized when the
sale was made" [emphasis added; alteration and citation
omitted]).  Accord Boston Elevated Ry. v. Metropolitan Transit
Auth., 323 Mass. 562, 572 (1949) (capital gain tax "sprang from"
sale of property; "[u]ntil there was a transaction completed by
the payment of the cash consideration, there was no taxable
gain"); Internal Revenue Service, Topic No. 409:  Capital Gains
and Losses, https://www.irs.gov/taxtopics/tc409
[https://perma.cc/AZ64-QENH]  ("To determine how long you held
the asset [for purposes of calculating the capital gain], you
generally count from the day after the day you acquired the
asset up to and including the day you disposed of the asset").[19]

---

property is acquired is excluded, and the date the property is
disposed of is included").

[19] The board also expressed concern that an entity that
sells a project prior to the expiration of its tax-exempt period
would benefit from a tax-exempt capital gain, but an entity that
did not timely sell, would be required to pay tax on the capital
gain.  Reagan vs. Commissioner of Revenue, ATB 2021 at 219-220.
This, however, is inherent in a fixed term; the obligations,
rights and privileges end when the term ends.  See note 16,
supra.  There is no suggestion that the c. 121A partnerships
acted in bad faith or attempted to "game the system" in any way.

ii.  Guaranty fund for condominium sales.  The board next relied on G. L. c. 121A, § 18D, discussed in part 2.d, supra, to support its conclusion that "on account of" a project does not extend to capital gain.  In particular, the section requires a c. 121A entity that sells condominium units within a project to reserve the "profit" from such sales in a guaranty fund to be used to pay expenses related to the project's rental units, among other restrictions.  G. L. c. 121A, § 18D.  The Legislature defined "profit" for the purposes of G. L. c. 121A, § 18D, as the proceeds from the condominium unit sales reduced by "the amount invested in the condominium, . . . any related costs and expenses reasonably attributable to any such sale . . . and all state, federal and other taxes and excises applicable to any gain derived therefrom" (emphasis added). Because the Legislature defined profit for the purposes of G. L. c. 121A, § 18D, as reduced by "all state . . . taxes and excises applicable to any gain derived" from condominium unit sales, the board concluded that the Legislature impliedly acknowledged that State taxes would be "applicable" to the capital gain from the sale of a project.

This conclusion ignores the purpose of G. L. c. 121A, § 18D, which, as specifically stated in the section, is to provide "an additional means of stimulating the investment of private capital in [blighted] areas, including the construction,

operation, management and maintenance therein of housing for low income persons and families"; accordingly, we disagree that the Legislature's use of the phrase "all state . . . taxes . . . applicable to any gain" evinces an implicit intent to deprive c. 121A entities of one of the key incentives in investing in blighted areas. See Conservation Comm'n of Norton v. Pesa, 488 Mass. 325, 332 (2021), quoting Bellalta v. Zoning Bd. of Appeals of Brookline, 481 Mass. 372, 378 (2019) ("we must avoid any construction of statutory language which leads to an absurd result"); Richardson v. UPS Store, Inc., 486 Mass. 126, 132 (2020), citing ROPT Ltd. Partnership v. Katin, 431 Mass. 601, 603 (2000) ("court may not interpret statutes to produce illogical result").

iii.  Letter ruling.  The board also relied on Letter Ruling 94-7 to support its construction of "on account of." Letter Ruling 94-7 concerned whether the c. 121A excise applied to the proceeds from the sale of a project.  The commissioner concluded that the excise did not apply to the sale proceeds. Letter Ruling 94-7, quoting G. L. c. 121A, § 10.  Although it was not relevant to the letter ruling, and without citing any authority or providing any rationale whatsoever, the commissioner then stated that, "[t]hese proceeds are subject to tax, not under [G. L. ]c. 121A, but under the general tax provisions of Massachusetts law (i.e., [G. L. ]c. 62 or [G. L.

]c. 63, as the case may be)." Id. The conclusory statement, which conflicts with the plain language of G. L. c. 121A, § 18C, the statute as a whole, and the legislative history, is not entitled to deference.[20] See G. L. c. 62C, § 3 ("The commissioner may prescribe regulations and rulings, not inconsistent with law, to carry into effect the provisions of [the tax] statutes"); Massachusetts Mun. Wholesale Elec. Co. v. Massachusetts Energy Facilities Siting Council, 411 Mass. 183, 194 (1991) ("an administrative agency has no authority to promulgate rules or regulations that conflict with the statutes").[21]

f. Annual income cap. In addition to pressing us to defer to the board's analysis, the commissioner contends that we should affirm the decision based on the use of the term "section" in G. L. c. 121A, § 18C (e). That provision caps the cumulative annual return on investment for § 18C entities to

---

[20] Following oral argument, the commissioner submitted the March 8, 1994 interdepartmental legal memorandum prepared by a Department of Revenue attorney, which apparently is the basis for the letter ruling. We afford it no deference. See generally Kisor v. Wilkie, 139 S. Ct. 2400, 2416 (2019) (declining to defer to agency staff's "ad hoc statement").

[21] Following oral argument, we asked the commissioner to provide data regarding the tax treatment afforded to capital gain realized by other c. 121A entities that have sold c. 121A projects within the tax exemption period. We agree with the parties that the data, which are incomplete, do not alter our analysis.

eight percent.  See note 9, supra.  Paragraph (e) also states, "Nothing in this section shall be applicable to the payment of dividends out of the profits from the sale of the capital assets of the corporation" (emphasis added).  G. L. c. 121A, § 18C (e). The commissioner maintains that the use of the word "section" refers to the entirety of § 18C, including paragraph 18C (f), the tax exemption provision, and argues that the term eviscerates the tax exemption for dividends (and distributions) from asset sales, including any capital gain from the sale of the project itself.  We disagree that the use of the term "section" should be given such weight.

Instead, it is clear in context that the statement regarding dividends from asset sales refers to the eight percent cap set forth in paragraph (e) and means only that the cap on the annual cumulative return on investment set forth in paragraph (e) does not apply to dividends paid from profit on asset sales.  This construction of the dividends provision is supported by the rest of paragraph (e), which provides that for certain projects "the preceding limitations on dividends shall not apply" if certain Federal or State agencies "allow[] a change in the allowable distribution or other measure to increase the rate of return on investment."  G. L. c. 121A, § 18C (e).  Accordingly, we reject the commissioner's argument that the Legislature's use of the term "section" evidences its

intent impliedly to limit the scope of the tax exemption set forth in paragraph (f), a separate paragraph of G. L. c. 121A, § 18C. Tellingly, the board declined to adopt the commissioner's argument; we decline to do so as well.[22]

3. Conclusion. For the foregoing reasons, we reverse the decision of the board.

So ordered.

---

[22] Because we conclude that the capital gain at issue was not taxable, we do not reach the Reagans' alternative argument that the board erred in adopting the Federal adjusted basis of the c. 121A projects.